**UNITED STATES of America,**
**Appellee,**

v.

**Jorge MEJIA, Defendant–Appellant.**

**Docket No. 05–3903–cr.**

United States Court of Appeals,
Second Circuit.

Argued: April 19, 2006.

Decided: Aug. 22, 2006.

Deirdre D. Von Dornum, Federal Defenders of New York, Inc., Appeals Bureau, New York, NY, for Appellant Jorge Mejia.

Michael Q. English, Assistant, United States Attorney (Michael J. Garcia, United States Attorney; Arthur Gollwitzer III,

Harry Sandick, Karl Metzner, Assistant United States Attorneys, on the brief), New York, NY, for Appellee United States.

Before JACOBS, PARKER, Circuit Judges, and OBERDORFER, District Judge.*

DENNIS JACOBS, Circuit Judge.

Jorge Mejia challenges the 37–month sentence imposed in the United States District Court for the Southern District of New York (Keenan, J.) following his plea of guilty to illegal reentry after deportation for an aggravated felony, in violation of 8 U.S.C. §§ 1326(a) and (b)(2). Mejia contends that the court erred in declining to reduce his sentence to account for the lesser sentence he presumably would have received in one of the thirteen districts that use a "fast-track" or "early disposition" program, which allows a defendant charged with illegal reentry to plead to a reduced sentence or to a lesser offense (such as entering the United States without inspection). Mejia argues that imposition of a sentence longer than would have been imposed if he had been found elsewhere creates an unwarranted sentencing disparity within the meaning of 18 U.S.C. § 3553(a)(6).

We affirm the sentence.

## BACKGROUND

### A. Deportation and Re-entry

Jorge Mejia emigrated legally from Mexico to the United States in 1980, together with his mother and siblings. In January 1997, when he was 28, Mejia was indicted in New York on murder (and related) charges. In April 1998, Mejia was acquitted of murder, but was convicted of criminal possession of a weapon in the second and third degree, and reckless endangerment, and sentenced to between 32 months to eight years in prison. After serving nearly four and a half years, Mejia was deported to Mexico in May 2002.

Following his deportation, Mejia's "common-law wife" and their son moved back to Mexico. Mejia claims to have found a good job there and to have rebuilt his life. In August 2004, Mejia illegally entered the United States—allegedly through California—and came to New York. Mejia claims that he was looking for his daughter (by another woman), whom he tried unsuccessfully to contact from Mexico; that he came to New York to make sure she was safe; and that he had no intention of staying in the United States for more than two or three weeks.

In August 2004, Mejia was arrested in Manhattan for attempting to steal a bicycle, and was charged with possession of burglar tools, criminal mischief, and attempted petit larceny. Mejia claims that he was just in the wrong place at the wrong time, talking in the street to an acquaintance who (without Mejia's knowledge) was in the process of stealing the bicycle. Mejia refused to plead to disorderly conduct, and was held in state custody pending trial.

While Mejia in state custody, the Bureau of Immigration and Customs Enforcement ("ICE") learned of Mejia's reentry and determined that the reentry was illegal. On September 29, 2004, Mejia was indicted in the Southern District of New York on one count of illegal reentry, in violation of 8 U.S.C. §§ 1326(a) and (b)(2). Pursuant to a writ of *habeas corpus ad prosequedum*, Mejia was brought into federal custody on October 13, 2004.

---

* The Honorable Louis F. Oberdorfer, United States District Court for the District of Co- lumbia, sitting by designation.

On February 8, 2005, Mejia pled guilty to the illegal reentry count. In his submissions and at the sentencing hearing on July 14, 2005, Mejia conceded that his Guidelines sentence was 46 to 57 months, but raised five arguments to support a non-Guidelines sentence: [1] that his motivation—to reunite with a lost child—was unusual and sympathetic; [2] that the Guidelines for illegal reentry impermissibly double-counted his criminal history because they relied on the criminal history to enhance both the offense level and the criminal history level; [3] that the availability of fast-track programs for persons charged with illegal reentry in other judicial districts created unwarranted sentencing disparities in violation of 18 U.S.C. § 3553(a)(6); [4] that the Guidelines sentence did not account for time Mejia spent in state custody during the pendency of his state case; and [5] that after serving his sentence he would spend additional time in immigration custody pending deportation. The district court rejected all of the arguments except the fourth, and imposed a non-Guidelines sentence of 37 months' imprisonment to take into account the time Mejia spent in state custody.[2]

The district court held that there is no unwarranted sentence disparity in Mejia's case that justifies a non-Guidelines sentence:

> The fast-track programs are, essentially, exercises in prosecutorial discretion. Contrary to the defense position, I believe this is authorized under *[United States v. Stanley,* 928 F.2d 575 (2d Cir. 1991)]. . . . Section 3553(a)(6) speaks of the "need to avoid unwarranted sentence disparities." The key word is "unwarranted." *There is nothing in [United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005)] . . . which*

> *alters the principle that prosecutorial discretion is permissible or is to be frowned upon or shunned.*

(Emphasis added.)

## B. Fast–Track Programs

Fast-track programs originated in the Southern District of California, where the number of illegal re-entry cases was overwhelming the capacity to prosecute violators. See *United States v. Galicia–Cardenas,* 443 F.3d 553, 555 (7th Cir.2006) (citing Alan D. Bersin, *Reinventing Immigration Law Enforcement in the Southern District of California,* 8 Fed. Sent. Rep. 254 (1996)). The United States Attorney in that district created a program that would recommend a 24–month sentence for defendants who violated 8 U.S.C. § 1326 in return for the defendants' waiver of various rights, including: indictment by a grand jury, trial by jury, presentation of a pre-sentence report, and appellate review of the sentence. The United States Attorneys in other districts along the southwest border, facing similar pressures, soon adopted their own programs, offering offenders an array of options, such as plea agreements to reduced sentences (by lowering the offense level) or to a lesser offense (*e.g.,* entering the United States without inspection, in violation of 8 U.S.C. § 1325).

In 2003, Congress expressly approved such programs in section 401(m)(B) of the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act ("PROTECT Act"), which instructed the United States Sentencing Commission to issue a policy statement authorizing a downward departure "pursuant to an early disposition program authorized by the Attorney General." Pub.L. No. 108–21, 117

---

**2.** The district court further imposed three years of supervised release and a $100 special assessment.

Stat. 650, 675 (2003) (codified in scattered sections of 18, 28, and 42 U.S.C.). As directed by Congress, the Sentencing Commission adopted U.S.S.G. § 5K3.1, "Early Disposition Programs (Policy Statement)," effective on October 27, 2003, which provides that, "[u]pon motion of the Government, the court may depart downward not more than 4 levels pursuant to an early disposition program authorized by the Attorney General of the United States and the United States Attorney for the district in which the court resides."

On September 24, 2003, Attorney General Ashcroft set forth the general criteria that must be satisfied in order to obtain the Attorney General's authorization for "fast-track" programs:

> (A)(1) the district confronts an exceptionally large number of a specific class of offenses within the district, and failure to handle such cases on an expedited or "fast-track" basis would significantly strain prosecutorial and judicial resources available in the district; or (2) the district confronts some other exceptional local circumstance with respect to a specific class of cases that justifies expedited disposition of such cases;
>
> (B) declination of such cases in favor of state prosecution is either unavailable or clearly unwarranted;
>
> (C) the specific class of cases consists of ones that are highly repetitive and present substantially similar fact scenarios; and
>
> (D) the cases do not involve an offense that has been designated by the Attorney General as a "crime of violence."

Memorandum from Attorney General John Ashcroft Setting Forth Justice Department's "Fast-Track" Policies (Sept. 22, 2003), 16 Fed. Sent. Rep. 134, 2003 WL 23475483, at *2 (Dec.2003). Once authorization has been granted, the district may implement the program in a manner deemed appropriate by its United States Attorney, so long as the program includes certain features: expedited disposition, waiver of pre-trial motions by the defendant, waiver of appeal, and waiver of the right to *habeas corpus. Id.* at *2–*3. Attorney General Ashcroft further explained that "fast-track" programs are

> based on the premise that a defendant who promptly agrees to participate in such a program has saved the government significant and scarce resources that can be used in prosecuting other defendants and has demonstrated an acceptance of responsibility above and beyond what is already taken into account by the adjustments contained in U.S.S.G. § 3E1.1.

*Id.* at *1.

Thirteen of the 94 federal districts have "early disposition" or "fast-track" programs for illegal reentry cases: Arizona; California (Central, Southern, Eastern and Northern districts); Idaho; Nebraska; New Mexico; North Dakota; Oregon; Texas (Southern and Western districts); and the Western District of Washington. Mejia's brief includes a chart calculating the (abbreviated) sentencing ranges that would have been applicable in the fast-track districts.

The record does not reflect whether the Southern District of New York could qualify for a fast-track program or why qualification has not been sought (or if sought, not granted). The data in the record, which are incomplete, indicate that the Southern District of New York has more than twice the number of illegal reentry cases as the districts of Idaho and Nebraska, and more than four times the number as the districts of North Dakota and Western Washington. Of course, various prosecutorial offices may differ as to the number and deployment of lawyers, the setting of priorities, and the press of other business.

## ANALYSIS

■ This Court reviews sentences imposed after *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), for "reasonableness," *id.* at 262, 125 S.Ct. 738; reviews a district judge's interpretation of the Federal Sentencing Guidelines *de novo, United States v. Adler*, 52 F.3d 20, 21 (2d Cir.1995) *(per curiam);* and reviews findings of fact under the clearly erroneous standard, *United States v. Selioutsky*, 409 F.3d 114, 119 (2d Cir. 2005).

Prior to *Booker*, courts could not grant a downward departure in order to compensate for the absence of a fast-track program. In *United States v. Bonnet–Grullon*, 212 F.3d 692 (2d Cir.2000), the district court ruled that, under the Guidelines, "it lacked the authority to grant downward departures solely in order to match lower sentences imposed in the Southern District of California as a result of the exercise of prosecutorial discretion in that district to bring charges under § 1325(a) instead of § 1326." *Id.* at 710. We agreed that the Guidelines authorize no such downward departure, citing policy statements in which the Sentencing Commission reflected its awareness of such possible disparities without providing for departures on that basis. While the holding of *Bonnet–Grullon* was couched in terms of what was permissible under the Guidelines, we added that, in any event, no unwarranted disparity is created when one district adopts a policy needed to facilitate the administration of justice in that district. *Id.* at 709. The opinion recognized that disparities created by the exercise of prosecutorial discretion are not "unwarranted."

In *United States v. Stanley*, 928 F.2d 575 (2d Cir.1991), we upheld as "warranted" the sentencing disparity resulting when prosecutors routinely drop the 18 U.S.C. § 924(c) gun charge if the drug dealer pleads guilty. Because the statuto-ry penalty for violating section 924(c) is higher than the two-level enhancement for use of a weapon, this plea-bargaining practice created a disparity between defendants who plead guilty and those who do not. We nonetheless held that decisions on whom to prosecute and on what charges are confided to the prosecutor's discretion, and that it is " 'constitutionally legitimate' for the prosecutor to threaten more serious charges to persuade the defendant to plead guilty." *Stanley*, 928 F.2d at 581 (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364–65, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978)).

As Mejia contends, pre-*Booker* cases do not control this appeal. Both *Stanley* and *Bonnet–Grullon* primarily considered the availability of a departure under the Guidelines and held that the Guidelines do not allow such departures; so the observations on the disparities created by plea-bargaining practices are *dicta*. Post-*Booker*, the inquiry as to whether a certain disparity is warranted is not limited to the considerations deemed relevant in the Guidelines or by the Sentencing Commission. District courts must consider, among other things, the factors enumerated in Section 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

■ Nonetheless, the analysis and reasoning of the *dicta* in *Bonnet–Grullon* is persuasive. To begin, Mejia's argument rests on a false equivalence between (on the one hand) defendants in fast-track jurisdictions who receive a benefit in exchange for the acceptance of certain detriments, and (on the other hand) a defendant in Mejia's position, who claims the benefit without suffering the detriment. As Mejia points out, he did not have the opportunity to make the bar-

gain; by the same token, the bargain has not been made, and no sentencing principle requires the sentencing court to mimic the transaction or compensate for its unavailability.

Congress expressly approved of fast-track programs without mandating them; Congress thus necessarily decided that they do not create the unwarranted sentencing disparities that it prohibited in Section 3553(a)(6). *See United States v. Martinez–Martinez,* 442 F.3d 539, 542 (7th Cir.2006). Under the plain wording of the PROTECT Act, a court may adjust a sentence downwards "pursuant to an early disposition program authorized by the Attorney General", U.S.S.G. § 5K3.1; there is no authorization for parallel adjustments on some other basis. To the contrary, the PROTECT Act was primarily designed to curtail courts' discretion to grant unauthorized downward departures. *See generally* Pub.L. No. 108–21, 117 Stat. 650 (2003).

Legislative history confirms that departures pursuant to fast-track programs were intentionally limited to authorized programs. Before passage of the PROTECT Act, the House of Representatives passed an amendment to a companion bill (the Child Abduction Prevention Act of 2003) which included a "commentary" section recognizing judicial authority to grant "limited departures" in accordance with structured early disposition programs, such programs to be reserved for offenses "whose high incidence within the district has imposed an extraordinary strain on the resources of that district as compared to other districts." 149 Cong. Rec. H2405, H2421 (Mar. 27, 2003) (amendment offered by Rep. Feeney). The amendment acknowledged that disparities would arise between the sentences of those within fast-track jurisdictions and those outside, but stated nevertheless that the recognition of fast-track programs "does not confer authority to depart downward on an ad *hoc*

basis in individual cases." *Id.; see also Martinez–Martinez,* 442 F.3d at 542 (detailing legislative history of PROTECT Act).

Mejia cites language from a 2003 Sentencing Commission report to Congress, in which the Commission implied that the adoption of fast-track programs in only some jurisdictions caused unwarranted disparity:

> The new statutory requirement that the Attorney General approve all early disposition programs hopefully will bring about greater uniformity and transparency among those districts that implement authorized programs. *Defendants sentenced in districts without authorized early disposition programs, however, can be expected to receive longer sentences than similarly-situated defendants in districts with such programs. This type of geographical disparity appears to be at odds with the overall Sentencing Reform Act goal of reducing unwarranted disparity among similarly-situated offenders.*

U.S. Sentencing Comm'n, Report to Congress: Downward Departures from the Federal Sentencing Guidelines at 66–67 (Oct.2003), available at http://www.ussc.gov/departrpt03/departrpt03.pdf (emphasis added). The Sentencing Commission added, however, that the Congressional goal of limiting downward departures might be undermined if courts in districts that have no fast-track program try to compensate for the lack:

> Furthermore, sentencing courts in districts without early disposition programs, particularly those in districts that adjoin districts with such programs, may feel pressured to employ other measures—downward departures in particular—to reach similar sentencing outcomes for similarly situated defendants. This potential response by sentencing

courts could undermine the goal of the PROTECT Act to reduce the incidence of downward departures.

*Id.* at 67. The Sentencing Commission therefore rejected compensatory downward departures as a remedy for the disparity. *See also* Martinez–Martinez, 442 F.3d at 542 ("Given Congress' explicit recognition that fast-track procedures would cause discrepancies, we cannot say that a sentence is unreasonable simply because it was imposed in a district that does not employ an early disposition program."); *United States v. Jimenez–Beltre,* 440 F.3d 514, 519 (1st Cir.2006) ("[The use of fast-track programs in only some jurisdictions] certainly permits disparities but they are the result of a congressional choice made for prudential reasons, implicitly qualifying the general aim of equality."); *United States v. Martinez–Flores,* 428 F.3d 22, 30 n. 3 (1st Cir.2005) ("It is arguable that even post-Booker, it would never be reasonable to depart downward based on disparities between fast-track and non-fast-track jurisdictions given Congress' clear (if implied) statement in the PROJECT Act provision that such disparities are acceptable.").

The sentence imposed by the district court was reasonable, notwithstanding that Mejia may have been treated more favorably in jurisdictions that are overwhelmed by persons committing Mejia's offense. We join other circuits in holding that a district court's refusal to adjust a sentence to compensate for the absence of a fast-track program does not make a sentence unreasonable. *United States v. Castro,* 455 F.3d 1249, 1252–53 (11th Cir. 2006); *United States v. Marcial–Santiago,* 447 F.3d 715, 718–19 (9th Cir.2006); *United States v. Montes–Pineda,* 445 F.3d 375, 380 (4th Cir.2006); *Martinez–Martinez,* 442 F.3d at 542–43 (7th Cir.2006); *United States v. Jimenez–Beltre,* 440 F.3d 514, 519 (1st Cir.2006) (in *banc); United States v. Sebastian,* 436 F.3d 913, 916 (8th Cir. 2006); *United States v. Hernandez–Cervantes,* 161 Fed.Appx. 508, 511–13 (6th Cir.2005) (unpublished).

## CONCLUSION

The judgment of the district court is AFFIRMED.