05-4591(L)
U.S.A. v. Cavera

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2005

(Argued May 16, 2006          Decided October 11, 2007)

Docket Nos. 05-4591-cr(L), 05-5210-cr(CON)

_____

United States of America,

Appellee,

v.

Gerard Cavera, aka Gerry Lake and Peter Abbadessa,

Defendants-Appellants.

_____

Before:
                CARDAMONE, CALABRESI, and POOLER,
                Circuit Judges.

_____

Defendant Gerard Cavera appeals from the judgment entered August 23, 2005 in the United States District Court for the Eastern District of New York (Sifton, J.), convicting him, upon his guilty plea, of conspiring to deal in and transport firearms in violation of 18 U.S.C. § 371. Cavera was sentenced to 24 months imprisonment, 3 years supervised release, a $60,000 fine, and a $100 special assessment. Defendant challenges his sentence, alleging the district court erred by imposing a sentence above the advisory U.S. Sentencing Guidelines range of 12 to 18 months and in refusing to grant him a downward departure on the basis of his wife's illness. He also requests that the case be remanded to a different sentencing judge.

Affirmed in part, vacated in part, and remanded.

_____

—————————————

JEFFREY A. RABIN, Brooklyn, New York (Law Office of Jeffrey A. Rabin, Brooklyn, New York, of counsel), <u>for Defendant-Appellant Gerard Cavera, aka Gerry Lake</u>.

TARYN A. MERKL, Assistant United States Attorney, Brooklyn, New York (Roslynn R. Mauskopf, United States Attorney, David C. James, Assistant United States Attorney, Eastern District of New York, Brooklyn, New York, of counsel), <u>for Appellee United States of America</u>.

—————————————

Daniel A. Hochheiser, Hochheiser & Hochheiser, LLP, New York, New York, <u>filed a brief Amicus Curiae for the United States District Court for the Eastern District of New York</u>.

CARDAMONE, Circuit Judge:

This appeal prompts us to write further on the subject of federal criminal sentencing in the aftermath of United States v. Booker, 543 U.S. 220 (2005).[1] All agree that Booker removed the mandatory teeth of the United States Sentencing Guidelines (Guidelines) by rendering them advisory, and that Justice Breyer's remedy opinion put some bite back into the Guidelines by requiring courts when sentencing defendants to "consider" them. See id. at 259-60. We, like our sister circuits, are still putting flesh on the skeleton issue of what it means to consider the Guidelines, and -- as we address specifically in this case -- when and under what circumstances a district court may impose a non-Guidelines sentence.

Defendant Gerard Cavera (defendant) appeals the August 23, 2005 judgment of the United States District Court for the Eastern District of New York (Sifton, J.) following his conviction on a guilty plea to one count of conspiring to deal in and transport firearms in violation of 18 U.S.C. § 371. Although the recommended Guidelines range for Cavera's offense was 12 to 18 months imprisonment and a fine of $3,000 to $30,000, the district court imposed a non-Guidelines sentence of 24 months

_____

[1] Our initial opinion in this case, issued on June 6, 2007, prompted comments from several members of the Court. In an effort to address the concerns they expressed, the panel decided to withdraw the earlier filed majority opinion along with the concurring opinion and issue this new opinion in their place.

imprisonment, three years supervised release, a $60,000 fine, and a special assessment of $100.

On appeal Cavera maintains, and the government agrees, that the district court committed legal error by considering the population density of New York City in imposing a non-Guidelines sentence. We appointed amicus curiae counsel to brief the position taken by the district court because both parties agreed that the district court sentence was imposed in error. Amicus counsel's exposition of the issues was helpful to us, and we note his commendable candor in advising the Court that his extensive research unearthed scant judicial authority supporting the district court's sentence. Cavera also contends on this appeal that the district court erred by refusing him a downward departure based on his wife's medical condition and urges the case be remanded to a different district court judge for resentencing.

Under the circumstances of this case, the district court's reliance on the simple fact of population density to impose a non-Guidelines sentence constituted legal error and rendered defendant's sentence unreasonable. We must therefore vacate and remand the case for resentencing, although we see no reason to remand it to a different sentencing judge. Finally, the district court's refusal to grant Cavera a downward departure for family circumstances is not appealable.

FACTS AND BACKGROUND

## A.  Cavera's Personal Background

Cavera is over 70 years old and an army veteran.  After discharge from military service, he operated an auto garage during the 1970s and 1980s.  He retired from auto repair work in 1986 and eight years later went into the contracting business. With a net worth of over one million dollars, Cavera is married and has five adult children who live in New York State.  He and his wife have health problems.  He has been diagnosed with gout and Type II diabetes.  His wife was diagnosed with breast cancer in 1994.  In 1995 and 1999 she suffered heart attacks and continues to suffer from substantial heart problems.  In 2003 her breast cancer returned and she underwent a mastectomy.

## B.  Cavera's Crime

On April 8, 2004, two of Cavera's co-defendants, Peter Abbadessa and Anthony Lucania, along with a government confidential witness, traveled to Florida where Cavera lives when away from New York.  The confidential witness gave Lucania $11,500 for the purchase of firearms.  The FBI then surveilled Abbadessa and Lucania as they met with Cavera at his home.  While there Cavera gave Abbadessa and Lucania two boxes containing 16 firearms.  After the sale, Abbadessa and Lucania returned to New York with the confidential witness.

On June 23, 2004, a grand jury returned an 11 count indictment charging Cavera with various violations of federal gun trafficking laws.  On November 24, 2004, defendant plead guilty

to one count of conspiring to deal in and transport firearms in violation of 18 U.S.C. § 371.

## C. Cavera's Sentencing

At sentencing the district court calculated the Guidelines range for Cavera's offense to be 12 to 18 months and a fine of $3,000 to $30,000. However, the court decided to impose a non-Guidelines sentence of 24 months imprisonment, 3 years supervised release, a $60,000 fine, and a $100 special assessment. In a 21-page opinion, the sentencing court explained its rationale for imposing a greater non-Guidelines sentence. Looking at factor (a)(2) of 18 U.S.C. § 3553, which directs the court to consider, inter alia, the seriousness of the offense and the need for deterrence, it reasoned that gun trafficking in an urban environment like New York City requires heavier sentences. United States v. Lucania, 379 F. Supp. 2d 288, 293-96 (E.D.N.Y. 2005). The district judge also denied a downward departure for family circumstances noting that Cavera has ample financial resources and five adult children to care for his ill wife. Id. at 292-93. From the resulting judgment of conviction, Cavera timely appealed.

## DISCUSSION

### I  Standard of Review

We review both Guidelines and non-Guidelines sentences for reasonableness. United States v. Rattoballi, 452 F.3d 127, 131 (2d Cir. 2006). The reasonableness standard entails two elements: procedural reasonableness and substantive

5

reasonableness. Id. at 131-32. To determine procedural reasonableness we examine three factors: whether the district court properly (a) identified the Guidelines range supported by the facts found by the sentencing court, (b) treated the Guidelines as advisory, and (c) considered the Guidelines together with the other factors outlined in 18 U.S.C. § 3553(a). Id. Substantive reasonableness depends on whether the "length of the sentence is reasonable in light of the factors outlined in 18 U.S.C. § 3553(a)." Id. at 132.

Even post-Booker, we continue to review a district court's interpretation of the Guidelines de novo and its findings of fact for clear error. See United States v. Mejia, 461 F.3d 158, 162 (2d Cir. 2006). We may review a refusal to downwardly depart only if the sentencing court misapprehended its authority to depart "or the sentence was otherwise illegal." United States v. Stinson, 465 F.3d 113, 114 (2d Cir. 2006) (per curiam). We observe finally that although under our post-Booker reasonableness regime we "have declined to adopt per se rules, opting instead to fashion a mosaic of reasonableness through case-by-case adjudication," on appeal we view "as inherently suspect a non-Guidelines sentence that rests primarily upon factors that are not unique or personal to a particular defendant." Rattoballi, 452 F.3d at 133 (emphasis added).

## II  The Non-Guidelines Sentence Based on Population Density Is Unreasonable in this Case

Both Cavera and the government assert the district court's non-Guidelines sentence is unreasonable.

### A.  In General

The crux of the district court's argument for Cavera's above-Guidelines sentence is its belief that trafficking firearms in urban environments threatens greater harm than trafficking in less densely populated places.  In explaining Cavera's sentence, the district court makes no reference to any characteristic particular to the defendant or his crime, but relies entirely on circumstances common to all defendants charged with gun trafficking in New York and similar large cities.  In so doing, the court seems to devise and employ a formula requiring the length of sentences for gun trafficking to rise or fall with the population density of the locality where the weapons are expected to end up.[2]

We emphasize our concern that the district court's demographics-based approach to sentencing runs contrary to one of the primary purposes of the Guidelines:  to diminish unwarranted sentencing disparity.  Prior to the passage of the Guidelines, Congress was troubled by studies showing disparate sentences imposed on federal defendants who had committed similar crimes.

---

[2]  This does not mean that a court may never consider characteristics of the locality in which the weapons are expected to end up in deciding the seriousness of a particular defendant's crime and especially in determining what is necessary properly to deter that defendant.  See infra note 3.

To deal with this problem, Congress enacted the Guidelines, bringing nationwide uniformity to federal criminal sentences. See Booker, 543 U.S. at 250 ("Congress' basic statutory goal [is] a system that diminishes sentencing disparity . . . ."); Rattoballi, 452 F.3d at 133-34 ("Disparate sentences prompted the passage of the Sentencing Reform Act and remain its principal concern."); United States v. Florez, 447 F.3d 145, 157 (2d Cir. 2006). Put differently, the Guidelines aim to eliminate disparities in sentences meted out by different district courts to defendants who commit similar offenses. Thus, under the Guidelines, a defendant who commits crime "x" in Chicago will be punished, all other things being equal, similarly to a defendant who commits crime "x" in Savannah. Indeed one of the § 3553(a) factors -- factor (a)(6) -- provides that in determining the particular sentence of a defendant, the court shall consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

With the above in mind, it seems plain that the district court's formulaic approach threatens to undermine a primary purpose of the Guidelines. The trial court's reasoning would result in a return to disparate sentences across districts where courts fashion sentences, not on facts unique to defendants' conduct or circumstances, but solely on the urban or rural character of each court's geographic jurisdiction. As the government correctly points out, were we to take this reasoning

8

to its logical conclusion, manifold crimes that take place in urban areas would be subject to a presumption of a higher non-Guidelines sentence; and, conversely, crimes committed in rural and less populated areas would be subject to a presumption of a lower non-Guidelines sentence.

Hence, we proceed with caution to review the district court's account for Cavera's sentence.

B. <u>Critique of the Support Cited by the District Court For Its Decision</u>

1. <u>Fast-Track Programs</u>

The trial court believes the congressionally authorized "fast-track" programs lend support to its approach. <u>See</u> <u>Lucania</u>, 379 F. Supp. 2d at 297. Fast-track programs, which offer a defendant a reduced sentence in exchange for a waiver of certain rights, started in districts along the southwest border of the United States where a high incidence of illegal re-entry cases severely strained local resources. The programs were authorized by Congress in § 401(m)(B) of the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act of 2003, Pub. L. No. 108-21, 117 Stat. 650 (2003). <u>See</u> <u>generally</u> <u>Mejia</u>, 461 F.3d at 160-61 (discussing history and regulation of the various fast-track programs). The district court insists that any disparity resulting from its consideration of New York City characteristics is "at least as well justified as the disparity created by these fast-track programs." <u>Lucania</u>, 379 F. Supp. 2d at 297.

9

We do not think the existence or congressional sanction of the fast-track programs is helpful to the district court's position. Since the date of the decision below we have explained that any disparity resulting from these programs is not unwarranted. See Mejia, 461 F.3d at 163 ("Congress expressly approved of fast-track programs without mandating them; Congress thus necessarily decided that they do not create the unwarranted sentencing disparities that it prohibited in Section 3553(a)(6)."). The participation of Congress in the establishment and regulation of fast-track programs sharply distinguishes such programs from the approach taken by the district court. While fast-track programs forsake uniformity to obtain other benefits, congressional participation ensures that other goals of the Sentencing Reform Act, including transparency, are preserved. See Michael M. O'Hear, Localization and Transparency in Sentencing: Reflections on the New Early Disposition Departure, 27 Hamline L. Rev. 357, 360-65, 373 (2004) (noting benefits of localization, but emphasizing need for formal localization mechanisms within the Guidelines to promote transparency in the incorporation of local factors in sentencing).

More fundamentally, Congress and, by proper delegation, the Sentencing Commission act appropriately when they assess the societal costs and benefits of punishing a category of crimes prosecuted in different districts in a uniform fashion. A federal court acting unilaterally is generally not in a position

10

similarly to assess societal costs and benefits. Moreover, as the Supreme Court has made clear, "[i]n our system, so far at least as concerns the federal powers, defining crimes and fixing penalties are legislative, not judicial, functions." United States v. Evans, 333 U.S. 483, 486 (1948); see United States v. Castillo, 460 F.3d 337, 356 (2d Cir. 2006).

## 2. Section 3553(a)(2)

We recognize that the district court rooted its non-Guidelines sentence in a § 3553(a) factor, namely subsection (a)(2), which provides that in crafting a sentence the court should impose a sentence that reflects the seriousness of the offense and the need for deterrence. 18 U.S.C. § 3553(a)(2). We do not mean to suggest that the consideration of sentencing disparity under factor (a)(6) trumps or should be given more weight than considerations under factor (a)(2). See Florez, 447 F.3d at 158 (noting that the weight to be given any § 3553(a) factor is committed to the discretion of the sentencing court and beyond appellate review). Rather, we hold simply that the district court erred in its analysis under factor (a)(2) by sentencing Cavera on the basis of a policy judgment concerning the gravity of firearms smuggling into a heavily populated area, like New York City, rather than on circumstances particular to the individual defendant and his crime, see Rattoballi, 452 F.3d at 133. The district court's approach effectively defines a separate crime -- gun trafficking in urban environments -- and fixes an above-Guidelines penalty for that crime.

11

We have cautioned the district courts against misapplying their sentencing authority to make policy decisions relating to an entire class of offenses. See United States v. Trupin, 475 F.3d 71, 76 (2d Cir. 2007) ("Sentencing policy is for Congress and the Sentencing Commission, not judges."); United States v. Sung Soo Park, 461 F.3d 245, 249 (2d Cir. 2006) ("[P]olicy determinations concerning the relative severity of punishments for particular types of offenses continue to be left to Congress."); cf. United States v. Mishoe, 241 F.3d 214, 218 (2d Cir. 2001) (holding, before Booker, that departures must be based on individual circumstances of defendant's case rather than on general rules). Recently, we outlined the statutory basis for the distinction drawn between sentences applicable to categories of crimes and those properly tailored by a district judge

> This distinction between policy decisions as embedded in the Guidelines and judicial decisions as imposed on a case-by-case basis is at work in the language of § 3553(a). . . . In § 3553(a)(2), the district court is instructed to consider "the need for the sentence imposed to reflect the seriousness of the offense," while in § 3553(a)(4), the district court is instructed to consider the sentencing range for "the applicable category of offenses" (emphasis added) as set forth in the Guidelines. The differing language between § 3553(a)(2) and § 3553(a)(4) reflects the difference between one particular defendant's crime and the large genre of offenses into which it falls. Indeed, [the difference] clearly indicates the Sentencing Commission and the district courts have two different roles with respect to the Guidelines.

Castillo, 460 F.3d at 355-56.

12

We acknowledge the courts have not drawn a neat line separating proper judicial consideration of a defendant and his crime from impermissible policy judgment concerning a genre of offenses, and examples may be found that blur the distinction. But the logic underlying Cavera's sentence presents no such challenge. The district court does not purport to establish that Cavera's crime was itself more harmful, but only that his crime falls within a category of offenses (gun crimes in densely populated areas) that the district court viewed as more serious, on average, than gun crimes in less urban communities. That the district court improperly injected its policy views into Cavera's sentence is clear to us, not because its rationale applies to other offenses in the stated genre, but because its rationale depends on characteristics of that genre to determine the gravity of this defendant's crime.

In sum, the district court based Cavera's sentence on its own public policy determination and, even though post-Booker courts enjoy greater discretion in sentencing, "a district court cannot import its own philosophy of sentencing if it is inconsistent with the § 3553(a) factors." Rattoballi, 452 F.3d at 132.

### 3. The District Court's Factual Argument

The district court's weak support for its assessment of the harmfulness of Cavera's crime cements our view that it resorted to policy preferences in imposing the sentence. Although the court's central factual argument -- that injury to innocent

13

bystanders is more probable in crowded environments -- is sound in theory, its application to New York City is unduly speculative. The City's five boroughs contain many densely populated areas where the district court's reasoning might apply, but they are also home to quieter neighborhoods, like Rockaway Point in Queens and suburban areas of Staten Island, where it would not apply. New York City is simply too large and varied a community to draw meaningful conclusions as to the potential impact of stray bullets that may someday originate from a trafficked firearm.

### III Rationale for Vacating Sentence in This Case

We do not decide that consideration by a sentencing court of population density or similar community-based factors is impermissible in all cases. See United States v. Anati, 457 F.3d 233, 238 (2d Cir. 2006) (suggesting that "the special impact of the offense in a particular geographical community" could be relevant to sentencing).[3] Nonetheless, the preceding discussion

---

[3] For example, § 3553(a)(2)(B) requires a sentencing court to consider what sentence is necessary "to afford adequate deterrence." If a community has very strict gun laws, and it was demonstrated that the prices of illegal guns were higher there than in communities with laxer gun laws and that, as a result of the higher prices, the profits from trafficking in such guns were also higher, then it might be that penalties might also have to be greater to achieve the same level of deterrence. The district court adverted to stringent gun laws in New York. But nothing in the record demonstrated that these gun laws made the business more profitable for gun-runners. And some commentators have suggested that high prices may exist in tight control cities for reasons that do not implicate higher profits. See Philip J. Cook & Anthony A. Braga, Comprehensive Firearms Tracing: Strategic and Investigative Uses of New Data on Firearms Markets, 43 Ariz. L. Rev. 277, 297 (2001). Under the circumstances, we do not

14

suggests the circumstances under which a district court can base a sentence on such factors in a manner that is both compatible with the § 3553(a) factors and in keeping with its judicial role will arise infrequently.

A heavy measure of caution is suggested also by several pre-Booker decisions of our sister circuits. See United States v. Barbontin, 907 F.2d 1494, 1498-99 (5th Cir. 1990) (reversing sentence where district court considered local standards as to what constituted a "significant" amount of cocaine); United States v. Thomas, 906 F.2d 323, 327-28 (7th Cir. 1990) (rejecting sentence based on degree of violence in city and state where offense was committed); United States v. Aguilar-Pena, 887 F.2d 347, 351-53 (1st Cir. 1989) (reversing upward departure based on high incidence of crime and insufficient law enforcement in specific location and community standards); see also United States v. Hadaway, 998 F.2d 917, 920-21 (11th Cir. 1993) (rejecting downward departure based on finding that many local residents committed the crime in question and would perceive sentence as too high, while allowing judges to consider community factors in sentencing within Guidelines). Each of these cases held that a sentencing court could not depart from the Guidelines on the basis of community-specific considerations.

These courts expressed concern that allowing departures based on such considerations would undermine the congressional

believe that an appropriate basis for a higher sentence was established in the instant case.

15

goal of reducing sentencing disparity. See, e.g., Aguilar-Pena, 887 F.2d at 352-53 (stating that any regime where equally blameworthy criminal received different sentences depending on where crime occurred would foster the wide variations Congress sought to eliminate). The decisions emphasized in addition that departures should be based on case-specific considerations rather than generalized disagreements with the Guidelines' treatment of whole categories of offenses. See, e.g., Hadaway, 998 F.2d at 921 ("Downward departures based on community standards . . . would apply generally to every violation of a specific federal statute by any person in a particular community."); Barbontin, 907 F.2d at 1499 (noting that judicial dissatisfaction, "no matter how steeped in real-world wisdom," is an untenable ground for departures). We share each of these concerns and find them pertinent today as before Booker.

Of course, we have recognized that, after Booker, "the Guidelines limitations on the use of factors to permit departures are no more binding on sentencing judges than the calculated Guidelines ranges themselves." Jones v. United States, 460 F.3d 191, 194 (2d Cir. 2006). Accordingly, district judges are afforded wide latitude to impose non-Guidelines sentences based on case-specific applications of the § 3553(a) factors. For example, in Jones, the district court had imposed a non-Guidelines sentence that was 50 percent below the bottom of the Guidelines range based on the judge's "gut feeling" about the defendant and findings on his personal circumstances. Id. In

16

affirming the sentence we observed that a district judge may consider the defendant's background together with the judge's "own sense of what is a fair and just sentence under all the circumstances," thereby fulfilling his or her "historic role." Id. at 195-96.

Read together, our cases addressing sentences outside the Guidelines range make clear that Booker requires the district courts to tailor sentences to reflect an application of the § 3553(a) factors. See, e.g., id.; United States v. Crosby, 397 F.3d 103, 114 (2d Cir. 2005) (emphasizing our expectation that post-Booker sentences will achieve more "individualized justice"). But such individualized sentencing does not authorize a district court to inject into sentencing decisions its policy preferences with respect to the category of offense in question or the kind of community in which it is perpetrated, see, e.g., Castillo, 460 F.3d at 357 ("[N]othing in Booker suggests that it is the task of district court judges to pronounce broad policy choices rather than specific sentences based on the specific facts of a case.").

Cavera's sentence is procedurally and substantively unreasonable. The district court committed procedural error by relying on its own policy judgment concerning all gun trafficking offenses in New York and comparable cities in fixing Cavera's sentence. See Castillo, 460 F.3d at 354 ("[T]he question . . . is whether the . . . imposition of a sentence that rejected the 100:1 ratio purely on generalized policy grounds . . . satisfies

17

[the] standard of procedural reasonableness."). As the resulting non-Guidelines sentence has not been explained by reference to any properly considered § 3553(a) factor, we also deem Cavera's sentence substantively unreasonable. Cf. Rattoballi, 452 F.3d at 134 ("A non-Guidelines sentence that a district court imposes in reliance on factors incompatible with the Commission's policy statements may be deemed substantively unreasonable in the absence of persuasive explanation as to why the sentence actually comports with the § 3553(a) factors.").

Because we hold that the district court's reliance on improper factors renders Cavera's sentence unreasonable, we do not address his contention that the district court erred by failing to afford him adequate notice of its intent to impose an enhanced non-Guidelines sentence.

### IV Cavera's Other Arguments Rejected

We turn now to the other two errors raised by defendant with regard to his sentence, both of which are without merit.

### A. Refusal to Grant Downward Departure

We may not review Cavera's challenge to the district court's refusal to grant a downward departure because the record suggests neither that the district court misapprehended its authority to depart nor that it imposed an illegal sentence. See Stinson, 465 F.3d at 114.

### B. Remand to Same Judge

Cavera next argues that should he prevail on appeal, the case should be remanded to a different judge. We grant such

18

remands only in the rarest instances. Even when a judge has erroneous views or made incorrect findings, resentencing before a different judge is appropriate only when the judge's fairness is seriously in doubt. United States v. Bradley, 812 F.2d 774, 782 n.9 (2d Cir. 1987). With the exception of personal bias, we examine the following three principal factors to determine if a case should be remanded to a different judge: whether (1) "the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected," (2) "reassignment is advisable to preserve the appearance of justice," and (3) "reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness." United States v. Awadallah, 436 F.3d 125, 135 (2d Cir. 2006). With these factors in mind, we decline to remand to a different judge. There is no suggestion that the district judge is biased, would ignore our instructions on remand, would have difficulty putting out of his mind his previously expressed views or findings determined to be erroneous, or would be otherwise unfair in resentencing Cavera. We therefore remand this case to the same district court judge.

CONCLUSION

For the foregoing reasons we vacate Cavera's non-Guidelines sentence and remand to the district court for resentencing in

19

accordance with this opinion. We affirm the district court's refusal to grant Cavera a downward departure.