**UNITED STATES of America**
**Appellant,**

v.

**Osama AWADALLAH Defendant–**
**Appellee.**

**Docket No. 05–2566–CR.**

United States Court of Appeals,
Second Circuit.

Argued: Dec. 12, 2005.
Decided: Jan. 26, 2006.

Robin L. Baker, Assistant United States Attorney for the Southern District of New York,(David N. Kelley, United States Attorney for the Southern District of New York, Karl Metzner, Harry Sandick, Assistant United States Attorneys, on the brief) for Petitioner United States of America.

Robert J. Boyle; Law Office of Robert J. Boyle, New York, NY, for Respondent Osama Awadallah.

Lewis J. Liman, Catherine Sykes; Cleary Gottlieb Steen & Hamilton LLP;

Alexandra A.E. Shapiro, Rachel Hemani; Latham & Watkins LLP; for Amicus Curiae New York Council of Defense Lawyers.

Before: FEINBERG, B.D. PARKER, and CUDAHY, Circuit Judges.[*]

B.D. PARKER, Jr., Circuit Judge.

On October 10 and 15, 2001, Osama Awadallah ("Awadallah") testified before a grand jury sitting in the Southern District of New York investigating the September 11, 2001 terrorist attacks. Awadallah was subsequently indicted on two counts of perjury. *See* 18 U.S.C. § 1623. Count One alleged that he falsely denied knowing the name Khalid Al–Mihdhar ("Al–Mihdhar"), who had been identified as one of the hijackers of the airplane flown into the Pentagon on September 11. Count Two alleged that, on October 15, after Awadallah was confronted with a handwritten examination booklet from one of his college courses containing Al–Mihdhar's name, he falsely denied that the handwriting was his own.

As the case proceeded to trial, it appeared that Awadallah's principal defense would be that the alleged false statements were not made knowingly, but were the result of exhaustion, confusion and intimi-dation stemming from the conditions of his pre-trial confinement. The Government indicated its intention to rebut this defense by calling grand jurors to testify about his appearance and manner during his testimony. On the eve of trial, the district court ruled that the Government could call grand jurors to testify about Awadallah's physical condition and the objective conditions surrounding his testimony, but would not be permitted to testify regarding their subjective impressions of his demeanor and appearance. For example, the Government would not be permitted to ask questions such as: "Did he appear confused when he testified?" The court concluded that such testimony was proscribed by Federal Rules of Evidence 606(b) and 403.[1] Specifically, the court ruled:

> [T]he grand jurors may testify as to, *e.g.*, the temperature, layout and occupancy of the room, or whether anyone raised their voice or made any threatening physical gestures, or whether Awadallah showed signs of physical injury. However, they may not testify as to their mental impressions: *i.e.*, that Awadallah did or did not appear lucid or composed, or did or did not appear confused, or that the prosecutor did or did not appear to be intimidating.[2]

---

[*] The Honorable Richard Cudahy, Circuit Court Judge for the United States Court of Appeals for the Seventh Circuit, sitting by designation

1. Rule 606(b) reads:

 Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside in-fluence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

 Rule 403 reads:

 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or delay, waste of time, or needless presentation of cumulative evidence.

2. The court also concluded that, to determine whether the testimony was admissible as lay opinion testimony under Rule 701, as the Government had urged, it needed more infor-

*United States v. Awadallah,* 401 F.Supp.2d 308, 320 (S.D.N.Y.2005).

On this interlocutory appeal, the Government challenges these restrictions and also seeks, on remand, to have the case assigned to a different district judge "to preserve the appearance of justice." Because we find that the district court's ruling fell well within the broad discretion afforded it on evidentiary questions, we affirm the ruling. In addition, because our examination of the record supplies no justification for the extraordinary step of remanding to a different district judge, we decline to do so.

## BACKGROUND

Immediately following the terrorist attacks of September 11, the United States Attorney for the Southern District of New York initiated a grand jury investigation.[3] Federal agents identified Nawaf Al–Hazmi ("Al–Hazmi") and Al–Mihdhar as two of the hijackers on American Airlines Flight 77, which crashed into the Pentagon.

A paper with the notation "Osama 589–5316" was found during the search of a car Al–Hazmi had abandoned at Dulles Airport in Virginia. Agents linked this telephone number to an address in the San Diego area at which Awadallah had lived approximately eighteen months earlier. Al–Hazmi and Al–Mihdhar had also lived in the San Diego vicinity around that time. In the fall of 2001, Awadallah was enrolled at Grossmont College in California in an "English as a Second Language" program (Arabic is his first language) and also was working as a security guard.[4]

Awadallah contends that he experienced consistent mistreatment at the hand of Government agents from the time he was first questioned, during his subsequent arrest and custody, and until the completion of his grand jury appearance. Because he alleges that this mistreatment cumulatively affected his behavior in the grand jury, we set out his contentions at some length.

According to Awadallah, on the afternoon of September 20, 2001, three FBI agents approached him as he emerged from his car outside his apartment in San Diego, and after he answered initial questions, approximately fifteen to twenty FBI agents encircled him. An FBI agent informed him that they needed to speak with him for about thirty minutes at the FBI office. The agents asked him to sign a consent form authorizing a search of his home and one of his two cars. Awadallah reported that he signed the form after the agents told him that they could secure a search warrant and "tear up his home." At the FBI office, he was presented with a consent form for the search of his other car. He refused to sign it and revoked the prior consent for the search of his first car.

The FBI interviewed him for approximately five and a half hours and told him to return for a polygraph test the next morning. Awadallah reported that the next morning, on September 21, he told the agents that he was in the process of obtaining counsel and would prefer to wait until his attorney was present. Awadallah claims that the agents said, "You don't have to have your lawyer with you." Awa-

mation about the testimony. *See* Fed. R. Evid. 701.

**3.** The grand jury was investigating, in addition to other offenses, the crimes of destroying and conspiracy to destroy an aircraft, *see* 18 U.S.C. § 32, bombing and bombing conspiracy, *see* 18 U.S.C. § 844, and seditious conspiracy to levy war against the United States, *see* 18 U.S.C. § 2384.

**4.** Awadallah, born in Venezuela and raised in Jordan, is a lawful permanent resident of the United States and a citizen of Jordan, having moved to this country around 1999.

dallah complied and took the polygraph test the same day. The agent who performed the test told Awadallah that it showed he had lied about his lack of prior knowledge of the events of September 11. After the test, the FBI questioned Awadallah again for approximately two hours.

After the questioning on September 21, Awadallah was arrested on a material witness warrant, see 18 U.S.C. § 3144, and detained without bail based on judicial findings that he possessed information material to the grand jury's investigation of the September 11 attacks. Also on September 21, Awadallah was taken from the FBI office to the San Diego Metropolitan Correctional Center ("MCC"), where he was held until September 27. Subsequently, he was moved to the San Bernardino County Jail and then to a federal facility in Oklahoma City. On October 1, he was moved to the New York City MCC where he was held in solitary confinement. Awadallah contends that throughout this period, at the various facilities where he was incarcerated, he was subjected to extremely harsh treatment, including physical abuse.[5]

On October 10, 2001, Awadallah was called before the grand jury and questioned for most of the day. When he was shown a photograph of Al–Hazmi, Awadallah identified him as someone he had met in San Diego and testified that, when he met him, Al–Hazmi was with someone else, but that Awadallah did not know that person's name.

In the course of his testimony, Awadallah denied knowing "Khalid Al–Mihdhar"

or "Khalid." The Government then showed Awadallah his college examination book, written in September 2001, which contained the following handwritten sentence: "One of the qui[e]test people I have met is Nawaf. Another one his name Khalid. They have stayed in S.D. for 6 months." Awadallah acknowledged that it was his examination booklet and that most of the writing in it was his own, but denied that "Khalid" and a few other words on the page were written in his handwriting. On October 15, 2001, Awadallah again appeared before the grand jury and recanted a portion of his prior testimony. He testified that his recollection of Khalid's name had been refreshed by his October 10 testimony and that the disputed writing was, in fact, his own.

Subsequently, Awadallah was indicted on two counts of perjury. The first count charged that he falsely denied knowing Khalid Al–Mihdhar, and the second count charged that he falsely denied that the handwriting in the examination book belonged to him. *United States v. Awadallah*, 173 F.Supp.2d 186, 191 (S.D.N.Y. 2001).

In December 2001, Awadallah moved to dismiss the indictment on a variety of grounds. He contended that (1) he had recanted his false testimony, (2) the Government violated the Vienna Convention on Consular Relations by not informing him of his rights as a foreign national, (3) the Government interfered with his right to counsel, and (4) the Government denied him due process while holding him in custody prior to his grand jury appearance as well as during his testimony. Awadallah

---

**5.** Awadallah alleges that the treatment he endured caused him to violate his religion in several ways: he was not permitted to bathe regularly and did not have access to Halal food or a Qu'ran. In addition, he claims standing water inhibited his ability to pray, and he was strip-searched many times—sometimes with women present and some searches were videotaped. He also states that guards cursed him and other Muslims generally, did not permit him to make phone calls for several days at a time, threatened his life, and physically harmed him.

also moved to suppress all physical evidence found by law enforcement officers who searched his home, computer, and cars, and all statements that he made to any Government agent from September 20, 2001 through October 3, 2001. In addition, he moved to dismiss the second perjury count as duplicative.

In an opinion dated January 31, 2002, the district court denied the motion on the grounds advanced by Awadallah, but raised two other possible bases for dismissal of the indictment. *United States v. Awadallah*, 202 F.Supp.2d 17 (S.D.N.Y. 2002). First, the court questioned whether Awadallah may have been the victim of a "perjury trap" because there appeared to have been no legitimate investigative purpose for the questions he allegedly answered falsely. *Id.* at 44. Secondly, the court questioned whether it might be appropriate in light of a constellation of factors surrounding his arrest—including the searches conducted by the Government, the circumstances surrounding his detention and interrogation, and the conditions under which he testified before the grand jury—for the court to exercise its "supervisory power" and suppress Awadallah's grand jury testimony. The court called for briefing on the first issue and an evidentiary hearing on the second. *Id.* at 52.

After an evidentiary hearing in February, the district court issued two opinions on April 30, 2002. *United States v. Awadallah*, 202 F.Supp.2d 55 (S.D.N.Y.2002); *United States v. Awadallah*, 202 F.Supp.2d 82 (S.D.N.Y.2002). The district court did not find a perjury trap existed, nor did it invoke its supervisory power to dismiss the indictment. However, the court ordered the suppression of Awadallah's grand jury testimony and the dismissal of the indictment on the ground that the material witness statute (18 U.S.C. § 3144) did not apply to grand jury proceedings and that

the affidavit submitted in support of the material witness warrant contained intentional, material misrepresentations and omissions.

The Government appealed and we reversed. We concluded that (1) the material witness statute applies to grand jury proceedings; (2) the warrant did not contain any material misrepresentations or omissions, and (3) the exclusionary rule did not require suppression of the statements and evidence obtained by the FBI on September 20 and 21, 2001. *United States v. Awadallah*, 349 F.3d 42 (2d Cir.2003) (Straub, J., concurring in judgment).

The case moved towards trial, and at a pretrial conference on May 16, 2005, in anticipation of the voir dire of trial jurors, the Government submitted a supplemental witness list containing names previously unknown to defense counsel. When counsel inquired as to their identity and the Government refused to disclose that information, the court ordered the Government to identify them. At that point, the court and defense counsel learned that the Government intended to call as trial witnesses several members of the grand jury that had observed Awadallah's testimony and returned the perjury indictment.

Awadallah had previously advised the court that his defense at trial would be "that any incorrect statements he may have made in his October 10 grand jury testimony were not knowingly made, [but were] ... the result of memory lapse, misunderstanding, exhaustion, confusion and intimidation." It was now clear that, in response to this proffer, the Government planned to call the grand jurors to testify to their impressions of Awadallah during his testimony. Whether this testimony should occur frames the first issue on this appeal.

After the Government identified the grand jurors as witnesses, the court and

 **131**

defense counsel learned that the Government had already contacted and interviewed many of them. Defense counsel then requested permission to contact the grand jurors. The court acceded and, on behalf of the defense, informed the grand jurors by letter they should contact the court if they were willing to be interviewed by defense counsel. Six jurors agreed to be contacted.

At the May 16, 2005 conference, Judge Scheindlin ruled, initially under Rules 701 and 704, on the admissibility of the proposed testimony. She ruled that the grand jurors could testify as to the physical conditions of the room during the testimony, Awadallah's physical appearance, and the behavior and manner of the prosecutor. However, she also ruled that the grand jurors would not be permitted to testify whether, in their opinion, Awadallah appeared confused during his testimony. After the conference, both parties requested that Judge Scheindlin revisit her ruling.

In a May 24, 2005, opinion, Judge Scheindlin imposed the same limitations on grand juror testimony but, this time, grounded her ruling on Rules 403 and 606(b), concluding that it had been premature to exclude the evidence based on the Rules 701 and 704, but that the testimony should still be limited. This interlocutory appeal followed.

## DISCUSSION

### I. District Courts' Evidentiary Ruling On Grand Juror Testimony

We review the exclusion of evidence pursuant to Rules 403 and 606(b) for abuse of discretion. *Old Chief v. United States,* 519 U.S. 172, 174 n. 1, 117 S.Ct. 644, 136

L.Ed.2d 574 (1997); *United States v. Salameh,* 152 F.3d 88, 110 (2d Cir.1998). We turn first to Rule 403.

### A. Rule 403

 Under Rule 403, so long as the district court has conscientiously balanced the proffered evidence's probative value with the risk for prejudice, its conclusion will be disturbed only if it is arbitrary or irrational. *See United States v. Han,* 230 F.3d 560, 564 (2d Cir.2000); *see also Hester v. BIC Corp.,* 225 F.3d 178, 181 (2d Cir.2000) ("A district court's evidentiary rulings will be disturbed only if they are 'manifestly erroneous.'") (quoting *Luciano v. Olsten Corp.,* 110 F.3d 210, 217 (2d Cir.1997)); *United States v. Robinson,* 560 F.2d 507, 515 (2d Cir.1977) (clarifying abuse of discretion standard for district courts' decisions pursuant to Rule 403). The district court found that Rule 403 "requires that the grand jurors be precluded from testifying as to their subjective impressions of Awadallah's testimony" because "the prejudicial effect of the proposed testimony substantially outweighs its probative value." *Awadallah,* 401 F.Supp.2d at 318. For the reasons discussed below, we conclude that this ruling involved no abuse of discretion.[6]

Rule 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

FED. R. EVID. 403.

Rule 403 required the court to balance the probative value of evidence relevant to

6. Because we find that the district court did not abuse its discretion by limiting the grand jurors' testimony pursuant to Rule 403, it is not necessary to determine whether the testimony was properly limited by Rule 606(b) or would be limited by Rule 701.

the "knowing" requirement of the perjury statute, 18 U.S.C. § 1623, against a range of dangers contemplated by the Rule and then decide whether the evidence should be admitted or excluded. The court did just that. As we show below, the record reflects that it considered the relevant factors, conducted the appropriate balancing, and arrived at a narrowly crafted compromise.

### 1. Probative Value of the Evidence

The Government's principal argument for abuse of discretion is that the district court necessarily struck the wrong balance between relevance and prejudice by dramatically understating, or underappreciating, the probative value of the grand juror testimony. According to the Government, Judge Scheindlin ignored that this "powerful evidence of Awadallah's guilt" is the strongest, most reliable evidence the Government can present to prove the knowing element of perjury, the element upon which this case will most likely turn.

We find this argument curious in light of the fact that, as the district court noted, the Government has tried hundreds, if not thousands, of perjury cases without eliciting opinion evidence from a grand juror to prove knowledge. None of our opinions indicate that a grand juror has ever previously been called in this Circuit to give such testimony and, as authority, the Government has uncovered only a lone out-of-circuit case where a grand juror testified about a subject matter other than materiality of a defendant.[7] As the district court noted, "a trial strategy is not improper merely because it is innovative; but, when such a strategy has almost never been used, there is generally a good reason." Suffice it to say, we have some difficulty

understanding why a class of testimony that is unprecedented in this Circuit can, at the same time, be the most reliable, powerful evidence available to the Government in a relatively straight-forward perjury prosecution.

■ Probative value is also informed by the availability of alternative means to present similar evidence. Specifically, the Supreme Court has advised that the "Rule 403 'probative value' of an item of evidence ... may be calculated by comparing evidentiary alternatives." *Old Chief*, 519 U.S. at 184, 117 S.Ct. 644. The availability of alternative testimony does not alone provide a basis for excluding evidence and the district court did not rely on such a basis here; however, it did properly consider alternatives as a factor in balancing the probative value and the risk of prejudice. *See id.*

The defendant stresses that, in addition to calling the grand jurors (who are permitted to testify under the limitations imposed by the district court), the Government could also elicit essentially the same testimony from other categories of witnesses, such as the court reporter, the interpreter, or Assistant United States Attorneys who were present during the Grand Jury but are not expected to participate at trial.

The Government responds that the grand jurors' testimony is the most probative and reliable evidence of Awadallah's demeanor because the Government attorney would be cross-examined for bias, and the court reporter and interpreter who both participated in the proceeding are unlikely to have been as attuned as a grand juror would be to Awadallah's demeanor. They could also be cross-exam-

---

7. *United States v. Frazier* contained no analysis of this issue but merely mentioned in a footnote that reversal was not warranted by a grand juror's testimony that called defendant's testimony evasive. 944 F.2d 820, 822 n. 1 (11th Cir.1991).

ined for bias based on, for example, their employment arrangements with the Government. We are not especially persuaded. It seems intuitively unlikely that the interpreter or the court reporter, both of whom presumably were present for the entirety of Awadallah's testimony, would not have been attuned to his facial expressions, the pace of his answers, or his general demeanor. These observations are, to a certain extent, beside the point, since the Government is, of course, free to select whichever witnesses it believes will most effectively advance its case. But the fact remains that we see nothing about the grand jurors that makes them clearly more reliable than other witnesses to the events that transpired in the grand jury room.

## 2. Prejudice

As the Supreme Court, considering Rule 403, has explained the term " 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged," or in other words " 'an undue tendency to suggest decision on an improper basis.' " *Old Chief*, 519 U.S. at 180, 117 S.Ct. 644 (quoting FED. R. EVID. 403 advisory committee's notes).

Here, the district court identified two potential sources of prejudice: (1) a trial juror would likely unduly identify with, and give unwarranted weight to the testimony of, a grand juror witness, and (2) the introduction of grand juror testimony is likely to confuse the different standards of proof that apply to a trial jury and a grand jury. On the first potential source of prejudice, the court noted:

> There is a real risk that the trial jury will give undue weight to the testimony of the grand jurors. Similarly, the trial

jury may well defer to what they will perceive as the grand jurors' determination that Awadallah's testimony was knowingly false, rather than making its own determination. Rule 403 requires that evidence be excluded, even if relevant, if the jury will place undue weight on that evidence, to the neglect of their duty to evaluate the trial evidence for themselves. The danger of prejudice is heightened here because the proposed testimony goes to an ultimate issue in the case: any testimony from a grand juror that Awadallah appeared not to be confused, or that he appeared lucid and coherent, is tantamount to a statement that, in the grand juror's opinion, Awadallah's statements were knowingly false.

*Awadallah*, 401 F.Supp.2d at 318–319. Judge Scheindlin then identified a separate, but related, source of potential prejudice:

> One of the fundamental risks at a criminal trial is that the jury will infer the defendant's guilt from the fact of his indictment. Courts always stress that an indictment is merely a charge or accusation and that the Government must now prove the defendant's guilt beyond a reasonable doubt. The Government's proposed use of grand jurors to testify, in essence, as to their opinion of Awadallah's guilt and their reasons for indicting him, is squarely at odds with that policy.

*Id.* at 319.

The concerns articulated by the district judge are undoubtedly substantive ones. She acted well within the broad discretion afforded her when she concluded that permitting testimony by grand jurors regarding whether or not, in their opinion, the defendant's false statements were the product of confusion and/or intimidation potentially causes significant prejudice to

the defendant because it could be interpreted as a grand juror giving the petit jurors advice on how to determine the central issue of the case. However, as the district court explained, "to the extent that the grand jurors' proposed testimony goes to the objective, external circumstances of Awadallah's testimony, and not to the ultimate issue of his intent or knowledge, it is less prejudicial, and therefore admissible." *Awadallah*, 401 F.Supp.2d at 319 n. 47.

The Government contends that it simply seeks to elicit the grand juror's "impressions of Awadallah's demeanor and appearance, not their opinion of his mental state." This distinction draws an extremely fine line, one best entrusted to the trial court's expertise. Here, the court could easily view the proffered testimony as opinion and advice regarding the defendant's mental state, the key element in the case.

The Government argues that grand jurors often testify regarding materiality and that the proffered testimony in this case is no different. However, testimony regarding materiality typically concerns the scope and purpose of the grand jury's investigation. *See United States v. Byrnes*, 644 F.2d 107, 111 (2d Cir.1981); *United States v. Alu*, 246 F.2d 29, 34 (2d Cir.1957); *see also United States v. Conley*, 186 F.3d 7 (1st Cir.1999). Such testimony contrasts markedly with testimony from grand jurors regarding their subjective impressions of a witness. Although materiality and knowledge are both elements of perjury— § 1623 is violated by one who "knowingly makes any false material declaration"—the danger of prejudice attached to these two types of testimony significantly differs. Testimony about materiality involves factual statements, such as the subject matter of the grand jury investigation, not the mental impressions of grand jurors, the type of testimony excluded by the district court here. Thus,

cases such as *United States v. Conley, supra*, on which the Government relied, where grand jurors have testified on materiality are not especially helpful since they do not involve the type of prejudice identified by the district court.

 The Government contends that any potential bonding between the grand juror witness and the petit jurors could be cured through an appropriate instruction. We know that limiting or curative instructions cannot always undue the damage of prejudicial evidence. *See Bruton v. United States*, 391 U.S. 123, 129, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The district court believed that an instruction would not appropriately address the prejudice arising from the introduction of grand juror testimony. From this vantage point the answer to that inquiry is unknowable. It is also not determinative since the resolution of the problem was left to the district judge who has broad discretion under Rule 403 to balance the probative value of evidence against the risk of prejudice. "Only rarely—and in extraordinarily compelling circumstances—will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." *Conley*, 186 F.3d at 16 (internal quotation omitted). Because the testimony, although relevant, indisputably has potential to be highly prejudicial, we cannot say that the district court's limitation on the testimony of grand jurors was arbitrary or irrational. *See United States v. Perez*, 387 F.3d 201, 209–10 (2d Cir. 2004); *United States v. Han*, 230 F.3d 560, 564 (2d Cir.2000).

The line that the district court drew between permissible statements regarding objective manifestations and impermissible statements of subjective opinions will likely elide as actual questions are put to grand juror witnesses. At that time, the

district court will, in the exercise of its judgement, determine on which side of the line a specific question falls.[8] We decline the government's invitation to define this line more precisely based on hypothetical questions. The district court will make such determinations when appropriate, and we leave it to its expertise.

## II. Remanding to a different judge

■ Remanding a case to a different judge is a serious request rarely made and rarely granted. Reassignment is warranted only "where special circumstances warrant it, that is, where we are persuaded that the original judge would have substantial difficulty in putting out of her mind her previously expressed views, or where reassignment is advisable to preserve the appearance of justice." *United States v. Ming He*, 94 F.3d 782, 795 (2d Cir.1996). Significantly, as the Government points out, the Office of the United States Attorney for the Southern District of New York has not made such a request since 1973 and that request was denied. *United States v. Griesa*, 481 F.2d 276, 278 (2d Cir.1973). In fact, as the *amicus curiae*[9] notes, in each of the cases the Government cites where a reassignment request has been granted, the request has been submitted by the defendant or initiated *sua sponte* by the court on the defendant's behalf.

■ With the exception of personal bias, this Court examines the following principal factors to determine whether a case should be remanded to a different judge:

(1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*United States v. Robin*, 553 F.2d 8, 10 (2d Cir.1977) (per curiam). The Government's request for remand to a different judge is based on the second *Robin* factor—preservation of the appearance of justice.

■ The Government contends that the case should be remanded to a different judge because Judge Scheindlin: "(1) repeatedly acted in a manner that could be viewed as that of an advocate for the defendant, rather than that of an impartial arbiter; and (2) repeatedly issued rulings that could be viewed as indicating that she has prejudged the most significant ultimate issues in the case in favor of the defendant and against the Government." Appellant's Br. at 79–80.

In support of these contentions, the Government points out that the district judge raised issues *sua sponte* "that were at least potentially beneficial to Awadallah

---

**8.** Although, as the district court indicated, a clear line cannot be drawn based on hypothetical questions, inquiries such as, "Was the witness confused?" or "Did the witness seem distracted either by events in the jury room or by the conditions under which he was restrained?" may be barred. On the other hand, questions like, "Was the witness sweating profusely?" or "Did the witness stammer?" would not carry the same risk of prejudice. The principal basis for limiting questioning or cross-examination is that it

may probe the grand jury deliberation process or reveal the degree of consensus among grand jurors on important issues. (Appellee's Br. at 43–46.) However, the Government has a strong interest in attempting to prove the mental condition of Mr. Awadallah and certainly a legitimate concern about the limits of interrogation toward that end.

**9.** An *Amicus Curiae* Brief was submitted by The New York Council of Defense Lawyers.

and detrimental to the Government." Appellant's Br. at 80. The Government points to the January 31, 2002 opinion where the district judge, while denying various defense motions, raised the possibility that the Government had set up a perjury trap and also suggested that it may be appropriate for her to exercise her supervisory power to suppress Awadallah's grand jury testimony. At the hearing regarding these issues and Awadallah's motion to suppress, Judge Scheindlin raised *sua sponte* the issue of whether the examination booklet was the "fruit" of the FBI's investigation on September 20 and 21, 2001. These three actions are cited as key examples of why remanding to a different judge is required. Appellant's Br. at 81, 85, 89.

The fact that the district judge raised these issues *sua sponte* is, to our minds, dwarfed by the fact that, in each instance, she ruled in the Government's favor: she concluded that no perjury trap had been set, she did not evoke her supervisory powers to suppress the grand jury testimony, and she did not rule on the issue she raised regarding whether the examination booklet was the product of the FBI's September 20 and 21 investigation. Notwithstanding the fact that Judge Scheindlin consistently ruled in the Government's favor on these points, the Government still maintains that these events illustrate that she regularly acted as an advocate for the defendant.

█ However, a district judge is not a spectator. We can readily envision occasions when active involvement by a trial judge is required to ensure that problematic issues are raised and examined. When a trial judge observes occurrences that potentially call into question the fairness of the proceedings or the thoroughness of a defense, it is incumbent on the judge to inquire. While impartiality is required, the distance between disengagement and officiousness leaves district judges considerable leeway to satisfy themselves that justice has been served.

In a similar way, the district judge's behavior on the evidentiary issue currently before us belies the Government's conclusion that she compromised the appearance of justice. The district judge originally issued an oral ruling at a pre-trial conference which limited the proffered testimony of grand jurors pursuant to Rule 701. After reconsideration, she explained in a written opinion:

> Without a proffer of the proposed testimony, it is impossible to know whether it would be based on objective perceptions, or on information that would not otherwise be available to the jury. It would therefore be premature to exclude the testimony on that ground. To the extent that the Court's May 16 preliminary ruling was based on Rules 701 and 704, it was therefore in error.

*Awadallah*, 401 F.Supp.2d at 315. Rethinking and ultimately changing her mind regarding Rule 701 (although the outcome remained the same) illustrates intellectual flexibility. The court's initial oral decision was issued in the interest of efficiency. Given an opportunity to revisit the issue, Judge Scheindlin refined her thinking. As the Fourth Circuit has noted, a judge's "willingness to reconsider previously expressed views weighs against a finding that reassignment is necessary to preserve the appearance of justice." *United States v. North Carolina*, 180 F.3d 574, 583 (4th Cir.1999).

We do not believe the appearance of justice is in jeopardy. During the course of managing a criminal case a trial judge is called on to rule on a host of substantive and procedural legal issues as well as many logistical ones relating to pre-trial proceedings and to the conduct of the trial.

Inherent in an adversary system is the reality that typically one side wins and the other loses. If losses compromised the appearance of justice, this system would grind to a halt.

In *Robin*, we noted that the consideration of the "preservation of the appearance of fairness must be balanced [against] counterveiling considerations of efficiency and feasibility." 553 F.2d at 11. We explained:

> Where the original judge has gained familiarity with a detailed factual record, which is vital to the determination to be made on remand, and the reversal is not based on erroneous findings or the admission of prejudicial evidence that would be difficult to erase from the mind, the case may properly be remanded to the original trial judge, since assignment to a different judge would only entail wasteful delay or duplicated effort.

*Id.* On this appeal, we have found no "erroneous findings." We also have no concern that the trial judge will have difficulty erasing evidence from her mind.

The Government contends that it is irrelevant whether Judge Scheindlin would have difficulty in applying legal precedent because its request is focused on the second *Robin* factor, "whether reassignment is advisable to preserve the appearance of justice." *Robin*, 553 F.2d at 10. However, it is relevant to the Government's argument that the district judge acted as an advocate for the defense.

Each of the cases that the Government cites where this Court reassigned a case to a different judge involved remands for sentencing or re-sentencing. *See United States v. Doe*, 348 F.3d 64 (2d Cir.2003); *Cullen v. United States*, 194 F.3d 401 (2d Cir.1999); *United States v. Padilla*, 186 F.3d 136 (2d Cir.1999); *United States v. Campo*, 140 F.3d 415 (2d Cir.1998) (per curiam); *United States v. Londono*, 100 F.3d 236 (2d Cir.1996); *United States v. Leung*, 40 F.3d 577 (2d Cir.1994); *United States v. Robin*, 545 F.2d 775 (2d Cir.1976). In those cases, unlike here, on remand the judge would be the fact finder. Here, the district court will not be the fact-finder, the jury will determine the facts, and the jurors will come to their role having not been privy to the pretrial proceedings and the rulings that led to this appeal. For these reasons, we deny the Government's motion to remand this case to a different judge. We have considered appellants' additional arguments and find them without merit.

## CONCLUSION

Because we find that the district court's limitation on grand juror testimony involved no abuse of discretion, we affirm the evidentiary ruling. Because we find no basis for remanding this case to a different district judge, we remand to Judge Scheindlin for further proceedings. The mandate shall issue forthwith.