S16A1246. ELLIS v. THE STATE.
(794 SE2d 601)

MELTON, Justice.

This case arises out of the criminal convictions of former DeKalb County Chief Executive Officer W. Burrell Ellis, Jr., for perjury and attempt to commit theft by extortion.[1] The charge for attempted extortion stemmed from Ellis' alleged efforts to procure a $2,500 political campaign contribution from a DeKalb County vendor by threatening to cut the vendor's contract with the County if the vendor did not contribute to Ellis' campaign, and the perjury charges stemmed from Ellis allegedly lying to a special purpose grand jury about his role in cutting the contract of the DeKalb County vendor. On appeal, Ellis contends, among other things, that his rights to substantive due process and equal protection of the laws were violated based on the inapplicability of the former version of OCGA § 45-11-4 to his case,

---

[1] Ellis was originally indicted on June 18, 2013, on 15 counts relating to attempted extortion and other acts of alleged corruption, and he was subsequently re-indicted on January 16, 2014, on 13 counts relating to attempted extortion, theft, coercion, bribery, and perjury. The first indictment was nolle prossed, and Ellis' first trial, beginning on September 8, 2014, ended in an October 21, 2014 mistrial. The State re-tried Ellis on June 1, 2015, on nine counts of the indictment, specifically, four counts of attempt to commit theft by extortion, three counts of perjury, one count of bribery, and one count of theft by extortion. Following a June 1, 2015-July 1, 2015 jury trial, Ellis was found guilty of one count of attempt to commit theft by extortion and on all three of the perjury counts. Ellis was acquitted on the remaining counts. On July 8, 2015, Ellis was sentenced to five years, with eighteen months to serve, for attempt to commit theft by extortion, and was given a concurrent sentence of five years with eighteen months to serve for one of the perjury counts. The remaining perjury counts were merged for sentencing purposes. Instead of filing a motion for new trial, Ellis filed a timely appeal directly to this Court. Following the payment of costs, his case was docketed here for the April 2016 term and orally argued on July 11, 2016.

and that the trial court erred with respect to various evidentiary matters at his trial. For the reasons that follow, we find that, although the trial court properly concluded that the inapplicability of former OCGA § 45-11-4 to Ellis' case did not result in any violation of his constitutional rights, we must nevertheless reverse Ellis' convictions based on certain evidentiary errors that occurred at his trial. Accordingly, we affirm in part and reverse in part to allow for a retrial on the charges of criminal attempt to commit theft by extortion and perjury.

1. Viewed in the light most favorable to the jury's verdict, the evidence presented at trial revealed that, in early June 2012, in an effort to raise money to eliminate his campaign debt, Ellis made a call to Brandon Cummings, the co-owner of Power and Energy Services, Inc. ("Power and Energy"), with the goal of obtaining a $2,500 campaign contribution from the company. Power and Energy was a vendor that had a $250,000 split award contract[2] to provide generator repairs for the DeKalb County Department of Watershed Management. Cummings indicated that he would discuss the possible contribution with his wife, who was the other co-owner of Power and Energy. Ellis called Cummings several times in early June to follow up about the campaign contribution, but these calls were not returned. Cummings and his wife decided not to make any contribution to Ellis' campaign, and Cummings asked his secretary to convey that message to Ellis if he called again. When Ellis called again, Cummings' secretary informed him that Power and Energy would not be contributing to his campaign. According to Ellis, the secretary told him that Power and Energy was "not interested in [his] services."

In late June 2012, Kelvin Walton, DeKalb County's Director of Purchasing and Contracting, called Power and Energy to discuss its contract with DeKalb County and the company's responsiveness to Ellis. Specifically, at Ellis' request, Walton had gotten in touch with Power and Energy to put pressure on the company to make a campaign contribution to Ellis because the company had not been returning Ellis' phone calls. To apply such pressure, Walton was supposed to let Power and Energy know that Walton had the power to cancel contracts as the Purchasing Director for the County. When Cummings learned that Walton had called the company, he called Ellis in an effort to clarify and address any specific contract concerns that may have existed, but Ellis did not answer when Cummings

---

[2] A split award contract allows more than one vendor to provide a needed service to the County. The maximum amount to be paid to the vendors for services under the split contract here was $250,000. The contract involving Power and Energy was split with another company named Prime Power. Thus, if the County chose not to use Power and Energy for a needed service, it could use Prime Power instead.

called. Cummings left Ellis a message to return his call, but he did not hear back from Ellis in response to the message.

In mid-September 2012, Cummings was approached by attorneys from the DeKalb County District Attorney's office who were investigating Ellis' solicitation of campaign contributions and possible connections to vendor contracts with the County. Cummings agreed to get in touch with the D.A.'s office if Ellis contacted him again about a campaign contribution or if anything questionable arose with regard to Power and Energy's contract. Ellis called Cummings about a week after the visit from the attorneys from the D.A.'s office, and, after Cummings received the message that Ellis had called, he informed the D.A.'s office. At that point, Cummings agreed with the D.A. that he would record his next telephone conversation with Ellis.

In a September 27, 2012 recorded telephone conversation between Ellis and Cummings in which Ellis asked for a campaign contribution four times, Ellis implied that he would cut Power and Energy's contract with DeKalb County if the company did not make a $2,500 contribution to his campaign. Specifically, Ellis told Cummings (1) he had previously told Purchasing Director Walton to "just go ahead and cut [Power and Energy's] contract" if the company was "not interested in [Ellis'] services"; (2) "If I can't get a follow up call . . . why are we doing business with this company? That's my thought"; (3) "You know, I could ask the question, why is DeKalb County doing business with a Cobb County business"; and (4) when asked why Power and Energy should give to his campaign, Ellis told Cummings "If I've got to answer that for you . . . I'm probably not talking to the right person." Cummings testified at trial that the call made him feel that if he did not contribute to Ellis' campaign, Power and Energy's contract with the County would be cut. He also testified that he felt like Ellis was threatening him.

A September 28, 2012 recorded conversation between Ellis and Purchasing Director Walton,[3] revealed that Ellis told Walton that the County should no longer do business with Power and Energy and that the County should "let [Power and Energy's contract] expire." Ellis also told Walton to "put a note in [Power and Energy's] file" so that there would be a record that Power and Energy does not "return phone calls," just in case Power and Energy ever tried to win another contract with DeKalb County. Walton testified that the effect of such a note would be to ensure that the vendor could not win another contract with the County.

---

[3] Walton was working as a confidential informant for the D.A.'s office at that time.

When Power and Energy did not make the requested campaign contribution, consistent with Ellis' earlier implication to Cummings, the company's contract with the County was put on hold, and the company's work with the County ceased. Although Ellis had informed Walton that Power and Energy's contract needed to be cut due to its failure to return his phone calls, Walton testified at trial that a company's failure to return phone calls did not present a valid reason for the County to terminate its contract with that company. Walton also testified that it was Ellis' idea, and not Walton's, for the County to cease doing business with Power and Energy.

On January 7, 2013, Ellis testified under oath before a special purpose grand jury that had been impaneled pursuant to a January 11, 2012 order. See OCGA § 15-12-100 (a) (superior court may impanel special purpose grand jury "for the purpose of investigating any alleged violation of the laws of this state or any other matter subject to investigation by grand juries as provided by law"). The order instructed that the special purpose grand jury would serve for a period "not to exceed 12 months" beginning on January 20, 2012, and stated the purpose of the special purpose grand jury as follows:

> The Special Purpose Grand Jury shall investigate the facts and circumstances surrounding the bidding, awarding, and management of contracts, as well as the policies and procedures of, and any payments made under and for any contracts by, the DeKalb County Department of Watershed Management during the period of January 1, 2002, through December 31, 2010. The Special Purpose Grand Jury, when making its presentments and reports, pursuant to OCGA [§§] 15-12-71 and 15-12-101, may make recommendations concerning criminal prosecution, and any changes to the policies and procedures of the DeKalb County Department of Watershed Management, based on the evidence presented, as it shall see fit.

The formal charge to the special purpose grand jury states:

> The main focus of your investigation will be to review the facts and circumstances surrounding and involving the bidding and awarding of contracts by the DeKalb County Department of Watershed Management during the period of January 1, 2002, through December 31, 2010. You are also tasked to review the policies and procedures used for and in this process by the DeKalb County Department of Water-

shed Management and the policies and procedures of any other DeKalb County department or agency which is involved in or directly connected with the above-stated process. You are also tasked to review the actions and conduct of any non-county individuals involved in or directly connected with the above-stated process.

. . .

I charge you that you are impaneled for the purpose of investigating all facts and circumstances surrounding and involving the bidding, awarding and management of contracts by the DeKalb County Department of Watershed Management during the period of January 1, 2002, through December 31, 2010.

I further charge you that you are impaneled for the purpose of investigating the policies and procedures of, and any payments made under and for any contracts by, the DeKalb County Department of Watershed Management during the period of January 1, 2002, through December 31, 2010.

Although the "main focus" of the special purpose grand jury was to investigate DeKalb County Department of Watershed Management contracts from "January 1, 2002, through December 31, 2010," Ellis was asked various questions connected to events that fell outside of that time period, and some of his responses to those questions led to the three perjury counts against him on which he was later found guilty. Specifically, when Ellis was asked if he had "ever" ordered that a DeKalb County vendor not be given work based on its failure to return phone calls, Ellis responded that, although he was a "stickler about returning phone calls," and that he had discussed with vendors his expectation "that they return phone calls," his answer was "no," and that he had "never" ordered that a contract be canceled or work not be given to a vendor based on that vendor's failure to return phone calls. Ellis also responded "no" when he was asked if he had ever ordered that a DeKalb County vendor with an award under a split contract not be given work. Finally, Ellis also stated before the special purpose grand jury, "I don't get involved in who gets work and who doesn't get work," and "I don't make the call to . . . not give work to people."

We find that the evidence presented at trial was sufficient to enable a rational trier of fact to find Ellis guilty of the two charges

upon which he was ultimately convicted — one count of perjury[4] and one count of attempt to commit theft by extortion — beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979). See also OCGA § 16-4-1 ("A person commits the offense of criminal attempt when, with intent to commit a specific crime, he performs any act which constitutes a substantial step toward the commission of that crime"); OCGA § 16-8-16 (a) (4) ("A person commits the offense of theft by extortion when he unlawfully obtains property of or from another person by threatening to . . . [t]ake or withhold action as a public official or cause an official to take or withhold action"); *Williams v. State*, 143 Ga. App. 210, 211 (2) (237 SE2d 693) (1977) (implicit threat sufficient to sustain conviction for theft by extortion); OCGA § 16-10-70 (a) ("A person to whom a lawful oath or affirmation has been administered commits the offense of perjury when, in a judicial proceeding, he knowingly and willfully makes a false statement material to the issue or point in question").

2. Ellis contends that his rights to equal protection and substantive due process were violated based on the trial court's conclusion that the provisions of former OCGA § 45-11-4 did not apply to him.[5] We disagree.

Former OCGA § 45-11-4, which applied to certain misdemeanors committed by public officers,[6] provided in subsections (b) and (c):

> (b) A public officer may be charged under this Code section for:
> (1) Malpractice, misfeasance, or malfeasance in office;
> (2) Using oppression or tyrannical partiality in the administration or under the color of his or her office;
> (3) When required by law, willfully refusing or failing to preside in or hold his or her court at the regular terms thereof, or when it is his or her duty under the law to do so;
> (4) Using any other deliberate means to delay or avoid the due course or proceeding of law; or

---

[4] Although Ellis was found guilty of all three counts of perjury against him, two of those counts were merged for sentencing purposes, resulting in a single conviction on one count of perjury.

[5] Because the trial court expressly ruled on Ellis' constitutional challenges here, and because we have not ruled on these constitutional challenges before, jurisdiction over this matter lies properly in this Court. Ga. Const. of 1983, Art. VI, Sec. VI, Par. II (1) (This Court "shall exercise exclusive appellate jurisdiction in . . . all cases in which the constitutionality of a law, ordinance, or constitutional provision has been drawn in question"). The State's motion to transfer this case to the Court of Appeals is therefore denied.

[6] Ellis is a "public officer" for purposes of former OCGA § 45-11-4. See former OCGA § 45-11-4 (a) (3) (" 'Public officer' means a county officer").

(5) Willfully and knowingly demanding more cost than he or she is entitled to by law in the administration and under color of his or her office.

(c) A conviction for violating subsection (b) of this Code section shall be punished as for a misdemeanor and, upon conviction in a court of competent jurisdiction, the accused shall be removed from office.

One of the procedural protections provided to "public officers" charged under former OCGA § 45-11-4 (b) is contained in OCGA § 45-15-11, which provides:

> Before an indictment charging any state official with violating subsection (b) of Code Section 45-11-4 is presented to a grand jury, the district attorney of the county where the grand jury will convene shall notify the Attorney General of such contemplated action.

Former OCGA § 45-11-4 also provided additional protections to public officers through subsections (f) (serving copy of indictment on the accused), (g) (right of accused to appear before a grand jury), (h) (providing copy of amended indictment to the accused), and (i) (true bill of indictment shall be published in open court) of the statute.[7]

However, former OCGA § 45-11-4 made clear in subsection (d) that all of the procedural protections provided under the statute applied *only* to those public officers who were charged under subsection (b) of the statute:

> (d) This Code section shall *only* apply to a public officer charged under subsection (b) of this Code section. This Code section shall not apply when a public officer is charged with any other crime alleged to have occurred while such official was in the performance of an official duty.

(Emphasis supplied.) As there is no dispute that Ellis was not charged under the provisions of OCGA § 45-11-4 (b) in this case, the trial court did not err in determining that the statute did not apply to him here.

However, there is one more statute relevant to the discussion of the applicability of former OCGA § 45-11-4 to Ellis' case, and that is the former version of OCGA § 17-7-52. OCGA § 17-7-52 governs the

---

[7] These provisions have been removed from the current version of the statute.

procedures for bringing indictments against "peace officers," and, under the former version of the statute, which was applicable at the time of Ellis' trial:

> Before an indictment against a present or former peace officer charging the officer with a crime which is alleged to have occurred while he or she was in the performance of his or her duties is returned by a grand jury, the officer shall be notified of the contemplated action by the district attorney of the county wherein the grand jury shall convene and the officer shall be afforded the rights provided in Code Section 45-11-4.

Former OCGA § 17-7-52 (a).[8] The former version of the statute went on to state:

> The requirements of subsection (a) of this Code section shall apply to all prosecutions, whether for misdemeanors or felonies, and no such prosecution shall proceed either in state or superior court without a grand jury indictment.

Former OCGA § 17-7-52 (b).

As the CEO of DeKalb County, Ellis was not a "peace officer." See, e.g., OCGA § 16-1-3 (11) (" 'Peace officer' means any person who by virtue of his office or public employment is vested by law with a duty to maintain public order or to make arrests for offenses, whether that duty extends to all crimes or is limited to specific offenses"). Thus, the provisions of former OCGA § 17-7-52 did not apply to him. However, Ellis claims that, because former OCGA § 17-7-52 provided protections to "peace officers" under OCGA § 45-11-4 that were not provided to him as a "public officer" who was not specifically charged under subsection (b) of that statute, OCGA § 45-11-4 on its face violates his rights to substantive due process and equal protection. Ellis is incorrect.

In evaluating Ellis' constitutional challenge to OCGA § 45-11-4,

> we recognize at the outset that all presumptions are in favor of the constitutionality of an Act of the legislature and that before an Act of the legislature can be declared unconstitutional, the conflict between it and the fundamental law must

---

[8] The current version of the statute no longer includes language under subsection (a) to afford a peace officer with "the rights provided in Code Section 45-11-4."

be clear and palpable and this Court must be clearly satisfied of its unconstitutionality. Moreover, because statutes are presumed to be constitutional until the contrary appears, the burden is on the party alleging a statute to be unconstitutional to prove it.

(Citation and punctuation omitted.) *JIG Real Estate, LLC v. Countrywide Home Loans, Inc.*, 289 Ga. 488, 490 (2) (712 SE2d 820) (2011). With these principles in mind, we address each argument in turn:

(a) *Equal Protection*: Ellis argues that OCGA § 45-11-4 violates the guarantees of equal protection of the laws found in Ga. Const. of 1983 Art. I, Sec. I, Par. II and the Fourteenth Amendment of the U. S. Constitution, because the statute subjects "public officers" to different standards than similarly situated "peace officers" charged with crimes. However, because Ellis' equal protection challenge to former OCGA § 45-11-4 does not involve any

fundamental right or suspect class . . . we examine [it] under the lenient "rational basis" test. See *State v. Nankervis*, 295 Ga. 406, 409 (761 SE2d 1) (2014). . . . [T]o survive an equal protection challenge, "the classifications drawn in the statute [must] bear a rational relationship to a legitimate end of government not prohibited by the Constitution." Id. at 408 (citation omitted).

*Barzey v. City of Cuthbert*, 295 Ga. 641, 645 (4) (a) (763 SE2d 447) (2014). In this regard, we find a rational basis for providing the additional procedural protections of former OCGA § 45-11-4 to "peace officers" charged with crimes alleged to have occurred while performing their official duties (see former OCGA § 17-7-52), while only providing such additional protections to "public officers" when they are specifically charged with a misdemeanor under former OCGA § 45-11-4 (b). Indeed, peace officers must make split-second decisions regarding the safety of themselves and others that can often involve life and death in the very moment that a decision is being made. When the performance of such official duties leads to possible criminal charges, it is rational to allow for additional procedural protections that will reduce the likelihood of a frivolous or harassing indictment being pursued against the officer and to help to ensure that the peace officer's split-second decisions can be fully explored in a more deliberative fashion. With public officials, on the other hand, decisions at the outset are generally made in a deliberative fashion, with the public official having the opportunity to exercise his or her discretion with the benefit of time. See *State v. Deason*, 259 Ga. 183, 184 (378

SE2d 120) (1989) ("[O]fficers afforded the privileges of OCGA § 45-11-4 have generally been, and presently are, county or municipal officers with broad governing power, who are vested with authority which requires them to exercise discretion"). Based on this fundamental difference between the roles assumed by "peace officers" in particular and other "public officers" in general, we find a rational basis for treating the two categories of officers differently, and find no violation of equal protection from the manner in which former OCGA § 45-11-4 classifies peace officers and public officers.[9]

(b) *Due Process*: Similar to the analysis relating to Ellis' equal protection challenge to former OCGA § 45-11-4, because his substantive due process challenge does not involve a

> fundamental right or suspect class . . . we examine [it] under the lenient "rational basis" test. See *State v. Nankervis*, [supra,] 295 Ga. [at] 409 . . . . Under this test, a statute does not violate due process in substance as long as it "bear[s] a rational relationship to a legitimate objective of the government." Id.

*Barzey*, supra, 295 Ga. at 645 (4) (a).

We have previously held that "the legitimate purpose of [former] OCGA § 17-7-52, in conjunction with [former] OCGA § 45-11-4, is to protect peace officers from harassing or frivolous charges before the grand jury." *State v. Smith*, 286 Ga. 409, 411 (688 SE2d 348) (2010). In this regard, former OCGA § 45-11-4 also protects public officers "against possible frivolous indictments pursued by persons aggrieved by the exercise of [the public official's] discretion." *Deason*, supra, 259 Ga. at 184. In reaching this legitimate objective, we find it rational to conclude that "peace officers" may need additional protections from frivolous indictments based on the sheer number of grave and split-second decisions that they must make. Whereas, because "public officers" are more likely to face scrutiny based on much more deliberative and measured actions, it is rational to conclude that those same protections are only needed in the more limited circumstances covered by OCGA § 45-11-4 (b). Because the difference in the manner

---

[9] This is not to say that the current versions of OCGA § 17-7-52 and OCGA § 45-11-4, which are much different from the former versions of the statutes, do not also contain distinctions that are rational. Indeed, the possibilities for making rational distinctions between classes are numerous, and the legislature is free to change its mind and modify statutes to provide new distinctions that are just as rational as those that were contained in the former versions of statutes. The fact that a statute has changed does not mean that it has necessarily become less rational simply because of the changes made.

in which "peace officers" and "public officers" are afforded protection from potentially frivolous indictments under former OCGA § 45-11-4 bears a rational relationship to a legitimate objective of the government, we find that the statute does not violate substantive due process.

3. With respect to the perjury counts against him, Ellis contends that the trial court erred by prohibiting him from arguing about his understanding of the scope of the special purpose grand jury's investigation. Ellis believes that, because the special purpose grand jury was tasked with investigating DeKalb County Watershed contracts and procedures from "January 1, 2002, through December 31, 2010," he should have been allowed to argue to the jury that questions relating to his September 2012 interaction with Cummings went beyond the scope of the special purpose grand jury's investigation and his understanding of the time period to which his answers were applicable. However, the trial court had previously ruled that the questions by the special purpose grand jury relating to Ellis' dealings with vendors and possibly cutting their contracts did not go beyond the scope of their investigation, as the questions were at least "relate[d] . . . indirectly to the subject of the investigation being conducted by the investigative grand jury." OCGA § 15-12-100 (c). Whether the questions went beyond the proper scope of the investigation was a legal matter for the trial court to decide, and Ellis has not enumerated its ruling on that matter as error. And, of course, Ellis would not be allowed to argue that he was permitted to lie in response to questions that he thought were outside of the scope of the special purpose grand jury's investigation. See *State v. Lampl*, 296 Ga. 892, 896 (2) (770 SE2d 629) (2015). Moreover, Ellis' personal understanding of the scope of the investigation is irrelevant to whether the questions were, in fact, within the proper scope. Nevertheless, to the extent that Ellis sought to adduce evidence of his personal understanding of the scope of the investigation as proof of his understanding of the questions that were put to him in the special purpose grand jury, such evidence could have been relevant to the question whether his false answers were the product of an honest mistake or misunderstanding. See 70 CJS Perjury § 11 ("[A] false answer given because of inadvertence, honest mistake, carelessness, neglect, or misunderstanding does not constitute perjury"). Even so, it appears that the trial court did not prohibit Ellis from offering evidence about his understanding of the questions put to him. Indeed, the trial court allowed Ellis to argue at trial

> that the statements that [he made to the special purpose grand jury and that were] the subject of the perjury charges

were *not knowingly or willfully made*; were *immaterial* to the issue or point in question before the [special purpose grand jury], or were not made during a judicial proceeding . . . [which also allowed Ellis to explore] whether the statements that g[a]ve rise to the perjury charges were material to the question at issue for the [special purpose grand jury].

(Emphasis supplied.)

As such, Ellis has failed to show an abuse of discretion in this regard.

4. We also find no error in the trial court's jury charge on perjury. Ellis argues that, although the trial court's jury instruction on perjury may have been legally correct, the trial court nevertheless erred by failing to include in the charge certain language submitted by the defense. However, Ellis is mistaken, as "[t]he trial court's failure to charge the exact language requested is not a ground for reversal [where] the charge given substantially cover[s] the principles of the requested charge." *Banks v. State*, 262 Ga. 190, 191 (3) (415 SE2d 634) (1992).

5. However, we do find error and harm from the trial court allowing a special purpose grand juror to testify at Ellis' trial in connection with the State's efforts to prove the perjury charges against him.

Here, the State introduced the testimony of the special purpose grand juror at Ellis' trial in an effort to prove that Ellis' false statements to the special purpose grand jury were material to the grand jury's investigation. See OCGA § 16-10-70 (a) ("A person to whom a lawful oath or affirmation has been administered commits the offense of perjury when, in a judicial proceeding, he knowingly and willfully makes a false statement *material to* the issue or point in question") (emphasis supplied). However, "[w]hether [a] false statement was material is normally an issue for the jury." (Citation omitted.) *Walker v. State*, 314 Ga. App. 714, 717 (1) (725 SE2d 771) (2012). In this regard,

[t]he materiality of the false testimony may be shown by the *record* of the proceedings in which the testimony was given, or by *the testimony there given*, or by all or so much of the *pleadings* therein as show the issues, together with such other *facts proved* on the trial as tend to show the testimony to be on a material issue.

(Citation and punctuation omitted; emphasis supplied.) Id.

Instead of relying on such appropriate evidence to allow the jury to make an independent decision on the issue of materiality, the State offered evidence of an individual special purpose grand juror's subjective *belief* about the materiality of Ellis' statements. Because the materiality of Ellis' alleged false statements was ultimately a question to be resolved by the trial jury based on objective evidence as set forth above, this subjective evidence was not appropriate. This is so because a grand juror's opinion about the significance of a defendant's false statements "potentially causes significant prejudice to the defendant[,] because it could be interpreted as a grand juror giving the petit jurors advice on how to determine the central issue of the case." *United States v. Awadallah*, 436 F3d 125, 133-134 (I) (A) (2) (2d Cir. 2006).

The question whether Ellis' alleged false statements to the special purpose grand jury were material to the grand jury's investigation was central to the trial jury's determination of whether or not Ellis was guilty of perjury. The special purpose grand juror testified at Ellis' trial that the grand jury's decision could have been affected if Ellis had given different answers in his testimony to the grand jury than the answers that he actually gave. Such testimony went directly to the issue of whether Ellis' alleged false statements were material to the issues being investigated by the special purpose grand jury, and served as a direct invitation for the jurors at Ellis' trial to resolve the issue of materiality consistent with the "opinion" of the individual special purpose grand juror. This was inappropriate. See *Awadallah*, supra, 436 F3d at 133-134 (I) (A) (2).

Furthermore, we cannot say that the error in allowing the special purpose grand juror to testify at Ellis' trial in this manner was harmless. Indeed, the main evidence against Ellis to prove that his statements to the special purpose grand jury were false consisted of the inconsistencies between his testimony before the special purpose grand jury and the statements that he made in his tape recorded conversations with Cummings and Walton. However, the main evidence showing that those alleged false statements were *material* to the special purpose grand jury's investigation — which is, again, an essential element of the crime of perjury — was the testimony of the special purpose grand juror stating his personal opinion about the impact of the alleged false statements on the grand jury's investigation. Such testimony "potentially cause[d] significant prejudice" to Ellis, as it very well could have been "interpreted as a grand juror giving the petit jurors advice on how to determine the central issue of the case." *Awadallah*, supra, 436 F3d at 133-134 (I) (A) (2).

We must therefore reverse Ellis' conviction for perjury to allow for a new trial on the perjury counts against him.

6. We also find reversible error with respect to an evidentiary matter relating to Ellis' conviction for attempt to commit theft by extortion. Specifically, Ellis contends that the trial court erred by prohibiting him from presenting any evidence of his interactions with several other vendors who were not named in the indictment and from whom he attempted to solicit campaign contributions. For the reasons that follow, we conclude that, pretermitting the question whether this evidence was admissible under OCGA § 24-4-404 (b) (admissibility of other crimes, wrongs or acts),[10] it nevertheless should have been admitted at trial, as the State opened the door to the admission of this evidence.

During the State's direct examination of Purchasing Director Walton, Walton was asked about an October 25, 2012 recorded conversation that he had with Ellis in which he and Ellis were discussing DeKalb County vendors in general. In this recording, Ellis spoke about having made a list of vendors who had and who had not made campaign contributions to him, and talked about leaving certain vendors alone. In connection with this recording, the State asked Walton:

> Q: When [Ellis] says that "he" was going to leave [the vendors] alone, what, if anything, did you do as a result of that comment?
> A: Yeah, when he said that he was just going to leave them alone, then I didn't write their name down or anything. That — that lets me know that he's not going to reach out to them anymore, that he's basically done with them.
> And, you know, I didn't know whether or not they had given a campaign contribution or not. *But normally, when he tells me that he's going to leave someone alone, they have contributed a campaign contribution already.*
> Q: And you said so you didn't write their names down. What names were you writing down?
> A: I was writing down vendors' name [sic] that he was giving me comments about.

---

[10] Compare *United States v. Ellisor*, 522 F3d 1255, 1270 (II) (B) (11th Cir. 2008) (With respect to the federal counterpart to OCGA § 24-4-404 (b), Federal Rule of Evidence 404 (b), "[e]vidence of good conduct is not admissible to negate criminal intent") (citation and punctuation omitted) with *United States v. Santos*, 201 F3d 953, 962 (7th Cir. 2000) (public official found guilty of extortion should have been allowed to introduce at trial evidence relating to vendors who were not denied work after failing to give campaign contributions, as such evidence was not used to show inadmissible "good acts" with other vendors, but to "cast doubt on the government's theory that the contractors who were cut off by the [public official's] office were cut off *because* they had refused to [make a campaign contribution]") (emphasis in original).

(Emphasis supplied.)[11]

Later in Walton's direct examination, the State also asked him about another recorded conversation between him and Ellis that took place in October 2012. In this recording, Ellis and Walton spoke about Ellis' conversation with Cummings in late September and Cummings' failure to return several of Ellis' phone calls, and Ellis expressed during the conversation with Walton that he was comfortable if people could not contribute to his campaign. To be more specific, Ellis told Walton, "You know me. I'm not pressuring anybody. How many people have told me they have a corporate policy and they can't give? I'm keeping a record of these people, and some of them have said . . . that we don't give to political campaigns. . . . I've never once said, 'don't do business with somebody because they won't contribute to my [campaign].' " In connection with the State's questioning of Walton regarding the recording, the following exchange took place:

> Q: Okay. Now, was that comment — that [Ellis] doesn't pressure people . . . to give and how many companies have corporate policies not to give and he's okay with that — *that general comment*, was that consistent with your experience with [Ellis]?
> A: No, it was not.

While the defense had been limited to speaking only about the vendors who were the subject of the indictment against Ellis, from the aforementioned exchanges between Walton and the State, we conclude that the State went beyond the boundaries that had been imposed on the defense. By doing so, the State created an implication that Ellis had a general policy of pressuring vendors to contribute to his campaign and that Ellis was being dishonest when he stated in

---

[11] The defense argued that the State had opened the door to evidence about other vendors based on the highlighted portion of Walton's testimony, and the State agreed that this portion of Walton's testimony should have been stricken from the record. However, despite the fact that the trial court concluded that Walton's entire answer should have been stricken, the record reveals that the trial court did not actually strike this answer. The trial court instead told the jury:

> Ladies and gentlemen, *the last question* — the question that was asked by the State and the response from the witness have been stricken from the record and you are not to consider the question or the response in your deliberation.

(Emphasis supplied.) The record reveals that "the last question" would refer, not to the exchange between the State and Walton about vendors being left alone based on having allegedly given campaign contributions, but the exchange *after* that relating to Walton writing down the names of vendors about whom he had received comments. Thus, the testimony that potentially opened the door to evidence of other vendors becoming admissible at trial was never stricken from the record. Despite this fact, the trial court ultimately overruled defense counsel's objection about the door having been opened to such evidence.

one of the recordings that he did not have a problem with, or seek retaliation against, vendors who did not contribute to his campaign.[12] Indeed, it is apparent from the recordings and Walton's testimony that Ellis was talking about vendors in general, and not just those who were the subject of the eventual indictment against him. Walton, as the Purchasing Director for DeKalb County, worked with Ellis on numerous contracts with vendors beyond those listed in the indictment. When the State made the aforementioned implication through questions to Walton about vendors in general, the State opened the door for Ellis to defend himself against that implication by presenting evidence of his own about his interactions with other vendors besides those listed in the indictment. See, e.g., *United States v. Santos*, 201 F3d 953, 962 (7th Cir. 2000) ("[I]t is improper to prevent a party from countering possibly false testimony favorable to his opponent even if that testimony should not have been admitted") (citations omitted).

We do not find the trial court's decision to exclude the evidence about other vendors despite the State opening the door to such evidence to be harmless, because we cannot say that it is highly probable that the exclusion of this evidence did not contribute to the verdict. *Lindsey v. State*, 282 Ga. 447, 450 (2) (651 SE2d 66) (2007) ("The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict"). Indeed, Ellis was acquitted of all other extortion charges against him, and we cannot say the jury's consideration of the only attempted extortion charge upon which he was found guilty may not have been affected by its inability to consider evidence relating to other vendors that could have rebutted the implication by the State that Ellis attempted to extort County vendors as a matter of general practice.

We must therefore reverse Ellis' conviction for attempt to commit theft by extortion to allow for a new trial on this charge as well.

7. Because Ellis' remaining enumerations of error are not likely to recur in any retrial, they will not be addressed here. See *Childress v. State*, 266 Ga. 425, 438 (5) (467 SE2d 865) (1996).

8. For the reasons set forth above, we affirm the trial court's ruling with respect to Ellis' constitutional challenges to former OCGA § 45-11-4, but we reverse his convictions for attempt to commit theft by extortion and perjury.

*Judgment affirmed in part and reversed in part. All the Justices concur.*

---

[12] Defense counsel objected to the State going beyond the limits that had been placed on the defense and again argued vociferously that the State had opened the door to evidence about other vendors based on its questioning of Walton in connection with this second recording, but the trial court once again overruled the objection.

DECIDED NOVEMBER 30, 2016 —
RECONSIDERATION DENIED DECEMBER 8, 2016.

*Gillen, Withers & Lake, Craig A. Gillen, Anthony C. T. Lake; Dwight L. Thomas; Kemay L. Jackson*, for appellant.

*Robert D. James, Jr., District Attorney, Christopher W. Timmons, Lenny I. Krick, Gerald Mason, Assistant District Attorneys*, for appellee.